## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **SHELLY KAYE STEVENS,** *Personal Representative of* **THE ESTATE OF JAMES ALLEN LESLIE STEVENS**<br>15410 Shoemaker Drive SW<br>Cumberland, Maryland 21502<br><br>    *Plaintiff,*<br><br>v.<br><br>**BOARD OF COUNTY COMMISSIONERS FOR ALLEGANY COUNTY, MARYLAND**<br>701 Kelly Road<br>Cumberland, Maryland 21502<br>    Serve on: Jacob C. Shade, President<br><br>**CRAIG ROBERTSON,** *in his Official Capacity as* **SHERIFF OF ALLEGANY COUNTY** *and Individual Capacity*<br>695 Kelly Road<br>Cumberland, MD 21502<br><br>**R. LEE CUTTER,** *in his Official Capacity as* **ASSISTANT ADMINISTRATOR OF THE ALLEGANY COUNTY DETENTION CENTER** *and Individual Capacity*<br>14300 McMullen Highway SW<br>Cumberland, MD 21502<br><br>**DAWN M. HOLLER, LPN**<br>148 Gay Street<br>Salisbury, Pennsylvania 15558<br><br>**STEPHANIE D. SHROYER, RN**<br>2430 Glen Savage Road<br>Fairhope, Pennsylvania 15538<br><br>**DONALD FREDERICK MANGER, MD**<br>14427 Hazen Road NE<br>Cumberland, Maryland 21502 | **Civil Action No.** _____ |

**LESLIE A. LOGSDON, RN**
13109 Deerfield Drive SW
Cumberland, Maryland 21502

**JAMES A. PIAZZA, PA**
224 Montpelier Court
Westminster, MD 21157

**LISA R. SHUTTS, LPN**
18712 Opessa Street SE
Oldtown, Maryland 21555

**JODI L. BRASHEAR, LPN**
12531 Goldens Ave SE
Cumberland, MD 21502

**WELLPATH, LLC D/B/A CORRECT CARE SOLUTIONS**
1283 Murfeesboro Road Suite 500
Nashville, TN 37217
        Serve on: Corporate Creations
        Network, Inc. #700
        2 Wisconsin Circle
        Chevy Chase, MD 20815

        *Defendants.*

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Shelly Stevens, by and through undersigned counsel, Charles N. Curlett, Jr. and Lauren McLarney of Rosenberg Martin Greenberg, LLP, brings this action on behalf of herself and the Estate of James Stevens and alleges as follows:

### INTRODUCTION

1.     This action arises out of the death of James Stevens ("Mr. Stevens") less than 20 hours after he was released from the Allegany County Detention Center ("the Detention Center"). Mr. Stevens reported to the Detention Center after the 2016 Thanksgiving holiday. He had a host of serious health issues but was in stable

2

condition at the time of his intake. Because of the holiday, Mr. Stevens was unexpectedly detained for four days awaiting a bond hearing, and in that time his health rapidly deteriorated. But for the deliberate indifference of the health care providers at the Detention Center who repeatedly failed to take him to the hospital while he suffered an on-going medical emergency, and the physician and physician's assistant who were consulted about Mr. Stevens' care, Mr. Stevens would have received necessary emergency medical intervention. Those deliberately indifferent acts and omissions arose out of policies, practices and customs adopted by the Sheriff of Allegany County, publicly expressed by the Assistant Administrator of the Detention Center and ratified by the Board of County Commissioners for Allegany County which discouraged Detention Center personnel from transporting inmates off-site for medical care as a cost-savings mechanism. Mr. Stevens died shortly after his release as a direct result of the Defendants' failure to respond to the medical emergency he suffered in detention, and the policies giving rise to those failures.

2.     Accordingly, Plaintiff seeks damages under 42 U.S.C. § 1983 for Defendants' violations of Mr. Stevens' rights under the Fourteenth Amendment to the U.S. Constitution, Article 24 of the Maryland Declaration of Rights, Maryland's common law of negligence, and Maryland's Wrongful Death Act.

## RELEVANT PARTIES

3.     Decedent James Stevens lived in Cumberland, Maryland. He died on November 29, 2016 after a four-day stay at the Allegany County Detention Center. The next day would have been his 45th birthday.

4.      Plaintiff Shelly Stevens is Mr. Stevens' widow. She lives in Cumberland, Maryland. Ms. Stevens is the personal representative of the Estate of James Stevens.

5.      Defendant Board of County Commissioners for Allegany County, Maryland ("the Board" or "County Commissioners") is a corporate entity, Md. Code Ann., Local Gov't § 9-403(b), and the governing body of Allegany County, Maryland. Allegany County is a "home rule" county, so the Board has direct control over county affairs. *See id.* at § 10-304. The Board erected the Allegany County Detention Center[1] pursuant to its statutory authority to establish and maintain a local jail. Md. Code Ann., Corr. Servs. § 11-102(a). The Board provides all funding for inmate care at the Detention Center and retains final authority over procurement of services at that facility. CS § 11-203(a)(ii); Md. Pub. Local Law, Allegany Co. § 160-1(A)(1). In that capacity, the Board has contracted with Wellpath, LLC or one of its affiliated companies to provide medical care at the Detention Center for over 14 years.

6.      Defendant Craig Robertson ("Sheriff Robertson") is the Sheriff of Allegany County, Maryland and elected head of the Allegany County Sheriff's Office. His powers stem from the Maryland State Constitution. Md. Const. Art. IV, § 44. He is the "managing official" of the Allegany County Detention Center and responsible for the safekeeping and care of inmates at that facility. *see* Md. Code Ann., Corr. Servs. § 11-103. Per Detention Center Regulations, Sheriff Robertson "answers to the citizens of Allegany County." He uses County funds to operate the Detention Center.

---

[1] The Board began funding the construction of the Allegany County Detention Center in 1997. The facility opened in 2002.

7.     Defendant R. Lee Cutter ("Captain Cutter") is the Assistant Administrator of the Allegany County Detention Center and a Captain in the Sheriff's Office of Allegany County. While Captain Cutter is at the top of the chain of command within the Detention Center, Detention Center Regulations state that "[t]he Captain is subordinate to the Sheriff." He frequently serves as spokesperson for the Detention Center in the media and at meetings held by Defendant County Commissioners.  He resides in Mount Savage, Maryland.

8.     Defendant Wellpath, LLC, which was known as "Correct Care Solutions" in 2016, is a limited liability company contracted to provide medical care services to inmates at the Allegany County Detention Center. In 2019, the company changed its name from Correct Care Solutions to Wellpath (hereinafter, Defendant Wellpath will be referred to by its former name). The company has a home office in Nashville, Tennessee, as well a regional office at 7250 Parkway Drive, Suite 400, Hanover, Maryland 21076. The Hanover, Maryland office is also affiliated with ConMed Healthcare Management.

9.     Defendant Dawn Michelle Holler is a Licensed Practical Nurse authorized to practice in Maryland. She obtained her license, number LP48638, from the Maryland Board of Nursing in 2011. At the time of the events giving rise to this action, Defendant Holler was employed by Defendant Correct Care Solutions and worked at the Allegany County Detention Center. At all relevant times, she was acting under color of law. Defendant Holler resides in Salisbury, Pennsylvania.

10.    Defendant Stephanie Diane Shroyer is a Registered Nurse authorized to practice in Maryland. She obtained her license, number R172319, from the Maryland Board of Nursing in 2006. At the time of the events giving rise to this action, Defendant Shroyer was employed by Defendant Correct Care Solutions and worked at the Allegany County Detention Center. At all relevant times, she was acting under color of law. Defendant Shroyer resides in Fairhope, Pennsylvania.

11.    Defendant Donald Frederick Manger is a Medical Doctor authorized to practice in Maryland. He obtained his license, number D09231, from the Maryland Board of Physicians in 1971. On information and belief, Dr. Manger was an independent contractor of the Allegany County Detention Center at the time of the events giving rise to this action. Dr. Manger maintains a family and pediatric practice in Cumberland, Maryland.

12.    Defendant Leslie Anne Logsdon is a Registered Nurse authorized to practice in Maryland.  She obtained her license, number RIO4131, from the Maryland Board of Nursing in 1989. At the time of the events giving rise to this action, Defendant Logsdon was employed by Defendant Correct Care Solutions and worked at the Allegany County Detention Center. At all relevant times, she was acting under color of law. Defendant Logsdon resides in Cumberland, Maryland.

13.    Defendant James Anthony Piazza is a Physician's Assistant authorized to practice in Maryland. He obtained his license, number C02779, from the Maryland Board of Physicians in 2004. At the time of the events giving rise to this action, Defendant Piazza was affiliated with ConMed Healthcare Management and an

independent contractor of the Allegany County Detention Center. At all relevant times, he was acting under color of law. Defendant Piazza resides in Westminster, Maryland.

14.     Defendant Lisa Shutts is a Licensed Practical Nurse authorized to practice in Maryland.  She obtained her license, number LP52483, from the Maryland Board of Nursing in 2015. At the time of the events giving rise to this action, Defendant Shutts was employed by Defendant Correct Care Solutions and worked at the Allegany County Detention Center.  At all relevant times, she was acting under color of law. Defendant Shutts resides in Oldtown, Maryland.

15.     Defendant Jodi Lynn Brashear is a Licensed Practical Nurse authorized to practice in Maryland. She obtained her license, number LP52378, from the Maryland Board of Nursing in 2015. At the time of the events giving rise to this action, Defendant Brashear was employed by Defendant Correct Care Solutions and worked at the Allegany County Detention Center.  At all relevant times, she was acting under color of law. Defendant Brashear resides in Cumberland, Maryland.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, because Plaintiff seeks redress for violations of a decedent's rights guaranteed by the United States Constitution and federal civil rights law, 42 U.S.C. § 1983.

17.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

18.     Venue is proper under 28 U.S.C. § 1391, because Plaintiff's claims arise from acts and omissions that occurred in Allegany County, Maryland.

19.     By letter dated November 20, 2017, Mrs. Stevens sent notice to the Board of County Commissioners of her intent to seek damages for the claims alleged in this Complaint, thereby satisfying the notice requirements of the Local Government Tort Claims Act. The letter was delivered on November 22, 2017.

20.     On November 22, 2019, Mrs. Stevens filed a Certificate of Qualified Expert and written election to waive arbitration with the Maryland Health Care Alternative Dispute Resolution Office, thereby satisfying the requirements to proceed in this Court with claims against Defendants Holler, Shroyer, Manger, Logsdon, Piazza, Shutts, and Brashear. *See* Md. Code Ann., Cts & Jud. Proc. § 3-2A-06(B)(b)(1).

## FACTS

21.     On November 17, 2016, the Allegany County Circuit Court issued a bench warrant for Mr. Stevens. He was charged with one drug offense and compelled to appear at the Allegany County Detention Center. He elected to surrender on November 25, 2016, the Friday after Thanksgiving.

22.     On or around November 17, 2016, the same day Mr. Stevens' warrant was issued, Defendant County Commissioners voted unanimously to enter an agreement with Defendant Correct Care Solutions regarding medical services at the Detention Center. Per a back-dated contract, Defendant Correct Care Solutions would provide medical care to inmates from July 1, 2016 to June 30, 2017 in exchange for $969,879 in County funds. On information and belief, that was the County's

second largest expenditure for the Detention Center, exceeded only by the amount budgeted for payroll and benefits for correctional staff.

23.   On November 24, 2016, Mr. Stevens spent the holiday with his family. In the late evening, pursuant to the warrant, Mr. Stevens voluntarily surrendered to the Sheriff's Office. He and Mrs. Stevens arrived at the Detention Center between 11:00 p.m. on Thanksgiving and 12:50 a.m. on Friday, November 25, 2016.

24.   On information and belief, Defendant Captain Cutter was present at the Detention Center when Mr. Stevens arrived.

25.   When Mr. Stevens surrendered, he was 44 years old and had many serious medical disabilities. He weighed approximately 375 pounds and had a history of congestive heart failure, chronic systolic hypertension (high blood pressure), asthma, sleep apnea, low testosterone, neuropathy, and diabetes mellitus. Mr. Stevens was insulin- and oxygen-dependent and wore compression stockings. He was prescribed and taking a host of medication to treat or manage his health conditions.

26.   In addition to prescription medications, Mr. Stevens smoked cigarettes and drank alcohol. He had a history of recreational drug use.

27.   In the months preceding his detention, Mr. Stevens was treated for two leg injuries, one of which was still healing upon his intake. On August 15, 2016, Mr. Stevens fell and suffered a laceration to his left lower leg. He received stitches and had several follow-up appointments at the Western Maryland Regional Medical Center for wound care and infection management. On November 8, 2016, a few weeks

before his detention and death, he returned to that provider because he tore some skin on his left leg while removing his compression stockings.

28.     Notwithstanding his comorbid medical conditions and recent injury, Mr. Stevens was in stable health at the time of his surrender. His family did not detect any distress during the Thanksgiving meal.  To the contrary, he was jovial and happy.

29.     Mr. Stevens thought he would be detained through the night, appear before a judge on Friday, November 25, 2016, and return home within 24 hours. Nevertheless, he brought his prescription medications and medical equipment with him to the Detention Center.

30.     Mr. Stevens was brought to the Detention Center holding cell at 12:55 a.m. by the Allegany County Sheriff's Office and received into custody at 1:41 a.m.

31.     Defendant Holler performed a primary medical screening of Mr. Stevens. According to Detention Center Regulations, the purpose of the reception screening is "to identify immediate medical problems/conditions" and assist in "the prevention of complications such as death, epidemic, suicides, and assaults." Mr. Stevens' screening was completed by 1:55 a.m., 14 minutes after his intake.

32.     The reception screening records reflect Mr. Stevens' complex medical profile. The Patient Questionnaire indicated he was being treated for asthma, diabetes, a heart condition, and high blood pressure. It also indicated he had been hospitalized and on a ventilator a "couple weeks ago." Per the Incoming Inmate Medication Record, he had 20 medications with him – all of which were prescribed to treat or manage heart disease, high blood pressure, diabetes, asthma or nerve pain –

as well as a portable oxygen tank, an aerosol delivery system, a Respironics chamber, insulin needles, TED socks, and two Velcro compression stockings.

33.     On information and belief, Mr. Stevens' oxygen tank, aerosol delivery system, Respironics chamber, and insulin needles were immediately confiscated.

34.     Defendant Holler also examined Mr. Stevens' drug history. Mr. Stevens reported that he drank alcohol and was a heavy smoker. He also admitted to using oxycodone and heroin regularly, as well as benzodiazepines when opiates were unavailable, and that he last used drugs on November 24, 2016. He was forthcoming about his drug use and provided substantial details to Defendant Holler.

35.     Mr. Stevens advised Defendant Holler that he did not have a history of alcohol withdrawal. Although he did report a history of drug withdrawal, "[l]oose stools" were the only symptom he described experiencing.

36.     The primary medical screening records confirm that Mr. Stevens was in stable condition at the start of his detention. His pulse and respiration rates, temperature and oxygen saturation were normal. Per a mental status checklist, he was alert and oriented, thinking logically, and acting and speaking appropriately. While the checklist also had options to indicate when a patient had slurred or slowed speech, was not making sense, acting lethargically, and/or experiencing hallucinations, those were not marked for Mr. Stevens.

37.     Nevertheless, in addition to his high-risk medical disabilities, Mr. Stevens said he was in pain, indicating a six out of ten on the pain scale, which is one level above "moderate pain."

38.     On information and belief, Defendant Holler did not identify where Mr. Stevens' pain was, diagnose its source, or examine Mr. Stevens' body.

39.     Mr. Stevens' blood pressure was also extremely high upon intake. His systolic blood pressure was 185 (over a diastolic blood pressure of 100). On information and belief, Defendant Holler consulted protocols that instructed her to contact a health care provider when a patient's systolic blood pressure exceeds 180.

40.     Defendant Holler did not consult a physician about Mr. Stevens' blood pressure.

41.     Because of his medical profile, Mr. Stevens was predisposed to heart attack, stroke, and complications after an infection, like sepsis or septic shock. However, it would have been difficult to distinguish the very early symptoms of a heart attack, stroke, diabetic shock or sepsis from those of Mr. Stevens' other chronic conditions. Accordingly, the standard of care for evaluating and diagnosing such a patient is to thoroughly exhaust all opportunities for early detection by performing a full physical and neurological assessment under the supervision of a physician.

42.     On information and belief, Defendant Holler did not perform a full neurological assessment or consult a medical doctor during Mr. Stevens' screening.[2]

43.     Instead, Defendant Holler issued three medical orders for Mr. Stevens. First, Defendant Holler referred him for Alcohol and Benzodiazepine Withdrawal treatment. That protocol calls for checking the patient's vital signs and assessing his

---

[2] Defendant Holler's "Opiate Withdrawal Provider Orders" note a verbal order from Defendant Manger, but on information and belief, he was not consulted until later.

CIWA-Ar[3] score every eight hours. It also calls for the patient to take daily Vitamin B1 supplements and 50 mg of Librium, a benzodiazepine and sedative used to treat anxiety and alcohol/benzodiazepine withdrawal symptoms, three times a day for three days and then two times a day for two days.

44.     Second, Defendant Holler ordered the Opiate Withdrawal protocol. That protocol, like the one described in the preceding paragraph, calls for checking the patient's vital signs and assessing his COWS[4] score every eight hours. It also instructs that medication may be provided as needed for vomiting, loose stools, and muscle pain and/or spasms.

45.     Third, Defendant Holler ordered a 2800 calorie diabetic diet for Mr. Stevens.

46.     Defendant Holler assigned Mr. Stevens to the general population instead of medical observational housing or isolation. Mr. Stevens' only housing accommodation was that he was to get a bottom bunk until his release.

47.     After the reception screening, Defendant Holler noted: "Screen complete. Opiate + Benzo abuse. I/M [Inmate] has extensive Health issues. Large quan[tit]y of medications. Ted Socks remain with inmate, and the Velcro compression wraps will be re-eval by MD in am. Insulin + Medication orders will be Reviewed with

---

[3] "CIWA-Ar" is the abbreviation for the revised version of the Clinical Institute Withdrawal Assessment for Alcohol, a 10-item assessment of whether and to what degree a patient presents certain symptoms common to alcohol withdrawal.

[4] "COWS" is the abbreviation for the Clinical Opiate Withdrawal Scale, an 11-item assessment of whether and to what degree a patient presents certain symptoms common to opiate withdrawal.

MD. I/M Was made aware of how to access medical. ROI [Release of Information] sent to Hosp, doctors + pharmacy."

48.     Defendant Holler began the two withdrawal protocols at 1:55 a.m. Mr. Stevens' CIWA-Ar and COWS scores were both very low; he scored a 0 and 1, respectively.[5]

49.     Defendant Holler took no further action with regards to Mr. Stevens' medical needs at that time.

50.     Just a few hours into his detention, Mr. Stevens was back at the medical unit.  At 5:02 a.m., correctional records note: "Stevens to medical." He returned six minutes later. There is no documentation in the records obtained from Defendant Correct Care Solutions regarding this visit.

51.     At 6:55 a.m., Defendant Holler issued orders for managing Mr. Stevens' diabetes. Those orders prescribed how and when Mr. Stevens' blood sugar would be taken and how much insulin would be dispensed.

52.     Over the next few hours, Defendants Shroyer, Manger, and Logsdon reviewed Defendant Holler's initial orders and evaluated Mr. Stevens' medical needs. Physician's Orders were given, and medication was prescribed.

53.     At 6:45 a.m., Defendant Shroyer approved Defendant Holler's preliminary screening of Mr. Stevens.

---

[5] Per the CIWA-Ar Score Sheet, a score of 0 – 9 means "Minimal or no withdrawal." Per the Opiate Withdrawal Provider Order, a score below 12, by itself, does not call for any actions to be taken by the clinician, such as contacting a health care provider.

54. Defendant Logsdon made a "Master Problem List" for Mr. Stevens. That list included the following problems: "IDDM [Insulin Dependent Diabetes Mellitus], HTN [Hypertension], Cardiac, Asthma, Obesity, Drug + Alcohol Abuse."

55. At 8:00 a.m., Defendant Manger approved by verbal order the diabetes protocol issued by Defendant Holler. To treat Mr. Stevens' cardiac conditions, asthma, and hypertension, Defendant Manger gave verbal orders that Mr. Stevens would continue taking the physician-approved medication he brought to the Detention Center from his own supply and at the prescribed dosages. Both of those orders were documented by Defendant Shroyer at 9:00 a.m.

56. Defendant Manger also prescribed five new medications for Mr. Stevens, pursuant to the two withdrawal protocols, including Vitamin B and Librium. Mr. Stevens was to take two 25 mg capsules of Librium every eight hours for three days and then, per a tapered dosing schedule, every 12 hours for two days. Three medications were prescribed, as needed, to treat vomiting, diarrhea and muscle pain.

57. Mr. Stevens' first dose of Librium was administered at 8:00 a.m.

58. Defendant Logsdon reviewed and approved the Physician's Orders. A checkmark, the date (11/25/16), and her initials appear in the margin of each page.

59. On information and belief, Defendant Manger was not physically present at the Detention Center during this time. All Physician's Orders given by Defendant Manger are noted as "V.O." in Defendant Shroyer's handwriting, indicating that they were given verbally and transcribed by Defendant Shroyer. And unlike the other health care provider Defendants, Defendant Manger maintained a

private practice and does not appear to have worked for Correct Care Solutions. Accordingly, despite the high-risk nature of Mr. Stevens' medical profile, Defendant Manger did not examine Mr. Stevens in-person before issuing orders regarding his care and treatment.

60.     On information and belief, neither Defendant County Commissioners nor Detention Center Regulations require or guarantee that a physician will be present at the Detention Center.

61.     At 8:52 a.m., the Western Maryland Health System ("WMHS") transmitted Mr. Stevens' medical records to the Detention Center. Earlier that morning at 3:36 a.m., Mr. Stevens signed a release authorizing the Detention Center to obtain records from WMHS, another provider,[6] and CVS pharmacy.

62.     The WMHS records thoroughly describe the first leg wound Mr. Stevens sustained in August and the second leg wound from November 8.

63.     On information and belief, Defendant Manger did not review the WMHS records.

64.     On information and belief, Mr. Stevens' leg wound was never examined by any of the Defendants.

65.     At 1:45 p.m., approximately 12 hours into Mr. Stevens' detention, Defendant Shroyer spoke with Mr. Stevens' daughter by phone, noting: "She will get

---

[6] At 3:45 a.m., Mr. Stevens signed a release for Chapman & Assoc. HC. It is unclear what time those records were received at the Detention Center.

[the] message to her Mother Shelly (I/M's Wife) to come back to pick up items that are not approved for use. (02 tank, Syringes, Inhaler Chamber, Aerosol Del. System)."

66.     "Allowable property" are items that an inmate is authorized to keep in their possession during their detention, like items issued by the facility or purchased from the commissary. Per the Detention Center Regulations, "[t]his also includes items approved by medical . . ."

67.     On information and belief, Defendant Manger determined that Mr. Stevens' portable oxygen tank was not necessary and thus not "allowable property." A Progress Note from 1:48 p.m., just minutes after Defendant Shroyer spoke to Mr. Stevens' daughter, reads: "Noted Meds + chart reviewed by Dr. Manger this AM + No O2 necessary at this time – sats [saturation levels] in [arrow up] 90's. S. Shroyer." This note was not documented in a untimely manner, but it was also crossed out.

68.     At 4:00 p.m., Defendant Logsdon gave Mr. Stevens his second dose of Librium.

69.     Because Mr. Stevens had a heart condition, Librium could exasperate, rather than treat, any stress to Mr. Stevens' heart brought on by withdrawal or some other undiagnosed, dormant or emerging condition.

70.     According to the Federal Bureau of Prisons' Clinical Guidance for Detoxification of Chemically Dependent Inmates, Lorazepam is the recommended medication for managing withdrawal based on a CIWA-Ar score. Unlike Librium, which is metabolized in the liver and can accumulate in patients with slow metabolisms or liver disease, Lorazepam's effectiveness is not limited by liver disease.

71.     Regardless of the medication selected, the standard of care for administering new medication to a patient like Mr. Stevens is to proceed with caution, closely monitor the effects of the new drug, and adjust the treatment plan based on the patient's reactions.

72.     Just 15 minutes after Mr. Stevens' second dose of Librium, at 4:15 p.m., Mr. Stevens' health began to noticeably deteriorate. His blood pressure increased to 190 over 112. He started vomiting: his COWS score reflects a "3" next to "GI Upset."

73.     Fifteen more minutes passed, and his conditioned worsened. At 4:30 p.m., his CIWA-Ar score had jumped from a 1 to a 7 due to excessive vomiting.

74.     Five minutes later, Mr. Stevens blood sugar was measured. It was 205, the highest of his entire detention.

75.     On information and belief, no medical doctor was consulted about Mr. Stevens' change in status during the afternoon or evening of November 25, 2016.

76.     Unfortunately, despite Mr. Stevens' hope for a short detention, Friday, November 25, 2016 was a court holiday. Mr. Stevens would not be able to appear before a judge that day and instead had to wait until Monday, November 28. Accordingly, he would spend at least four nights in the Detention Center – three more than he anticipated.

77.     On information and belief, Defendant Shroyer or Logsdon took steps to request that a Circuit Court Judge hold a bond hearing for Mr. Stevens. These efforts, made in response to Mr. Stevens' precarious health status, were unsuccessful.

78.    Mr. Stevens continued to decline. At 8:55 p.m., Defendant Logsdon took his vital signs. His respiration rate had increased from 20 to 24.

79.    A respiration rate at or over 20 is considered "tachypnea," thus both withdrawal protocols say that a health care provider should be contacted when respirations exceed 20.

80.    On information and belief, Defendant Logsdon did not contact a physician regarding Mr. Stevens' alarming respiration rate.

81.    Mr. Stevens' CIWA-Ar and COWS scores continued to increase. The assessments show Mr. Stevens was still vomiting to the same degree he was four hours prior, and he had increased sweating and anxiety.

82.    At this point, Mr. Stevens was clearly in medical distress. Vomiting, sweating and anxiety are all symptoms of myocardial infarctions, or obstructions of the blood supply to an organ or region of tissue that cause local death of the tissue.

83.    Moreover, a reasonably prudent nurse would know that vomiting could be related to, caused by, or exasperate Mr. Stevens' heart condition. Indeed, the Federal Bureau of Prisons warns that detoxification and withdrawal – conditions Defendants Holler, Shroyer, Manger, Logsdon, Piazza, Shutts and Brashear believed Mr. Stevens was experiencing – are stressors that may exacerbate medical decompensation.

84.    Accordingly, the standard of care for such a patient is to have a physician examine him, carefully monitor his symptoms, and adjust his treatment plan as needed. Standard emergency work-up for a patient like Mr. Stevens, who

presented with several risk factors and then three symptoms of myocardial infarctions, would include electrocardiogram, chest x-ray, cardiac enzymes, and monitoring.

85.     On information and belief, x-rays can be performed at the Detention Center. Statistics from Correct Care Solutions[7] regarding the provision of health care at the Detention Center show that in 2016, there were seven non-dental x-rays performed on-site.

86.     Per an addendum to the 2019 Request for Proposals to provide care to inmates at the Detention Center, Allegany County owns all of the medical equipment at the Detention Center.

87.     On information and belief, the Detention Center is not equipped to perform electrocardiograms.

88.     On information and belief, Defendant Logsdon neither performed a chest x-ray nor sought to have Mr. Stevens transported to another facility for an electrocardiogram. Furthermore, Mr. Stevens was not examined by a physician, and his medication schedule for Librium was not adjusted.

89.     Instead, in response to Mr. Stevens' deterioration, Defendant Logsdon did two things. First, she gave Mr. Stevens 20 ounces of Gatorade. Second, she

---

[7] Although the statistics for medical care at the Allegany County Detention Center appear on Conmed Healthcare Management letterhead, those documents reflect activity for years in which Defendant Correct Care Solutions was undisputedly the vendor providing medical care services at the Detention Center.

checked his oxygen saturation for the first time since his oxygen machine had been taken away.  His oxygen was at 94%. No further action was taken.

90.     At or around 9:00 p.m., Defendant Logsdon left the Detention Center. It is unclear who, if anyone, monitored Mr. Stevens' health during the next few hours.

91.     By the middle of the night, Mr. Stevens was in critical condition.  At or before 1:00 a.m., Mr. Stevens moved to a cot in the booking department. He was sweating, disoriented, and ill.

92.     At approximately 1:00 a.m., Defendant Logsdon returned to the Detention Center and found Mr. Stevens in the booking department. She observed beads of sweat on his face and forehead and noticed that his chest was damp; this condition is called diaphoresis. Correctional officers advised her that he had been vomiting occasionally. He was restless and disoriented, asking Defendant Logsdon, "Where's the remote?"

93.     Defendant Logsdon took Mr. Stevens' vital signs. His pulse rate had dropped 12 points, while his respiration rate increased to an alarmingly high rate. His oxygen saturation levels were fluctuating between 94% and 95%. His CIWA-Ar and COWS scores were markedly high at 19[8] and 13, respectively, because he was vomiting, sweating, and experiencing auditory disturbances, anxiety, and aches.

94.     At that point, Mr. Stevens was exhibiting symptoms common but not specific to a heart attack. A heart attack is diagnosed by either measuring the

---

[8] Per the CIWA-Ar protocol, a score of 19 indicates a "moderate to severe" condition.

electrical activity of the heart using electrodes or performing a blood test. The risk of death is greatly reduced the earlier a heart attack is diagnosed and treated.

95.     Given his medical profile, a reasonably prudent physician, in diagnosing Mr. Stevens' condition, would be unable to rule out the possibility that Mr. Stevens was in the early stages of heart failure.

96.     Mr. Stevens also qualified for sepsis, a toxic condition of life-threatening organ failure caused by the immune system's extreme response to an infection. To diagnose sepsis outside of a hospital setting, health care providers use a bedside prompt known as the quick Sequential Organ Failure Assessment ("qSOFA") to rapidly identify patients with suspected infections who are at greater risk of a poor outcome if they are outside of an intensive care unit. The qSOFA guidelines look for three symptoms: increased breathing rate, change in level of consciousness, and low blood pressure. Mr. Stevens had a source of potential infection (the leg wound), and two out of the three qSOFA symptoms: tachypnea and an altered mental state. Accordingly, sepsis could not be ruled out as the source of Mr. Stevens' deterioration.

97.     When a patient is suspected of having sepsis, a reasonably prudent health care provider would move him to a hospital or emergency room setting, where he would be given antibiotics, intravenous fluids, and oxygen, and closely monitored. Sepsis is a medical emergency that requires hospitalization; even with early treatment, it is fatal 20% of the time.

98.     On information and belief, the Detention Center was not equipped to diagnose or treat a heart attack or sepsis.

99.     Even if Mr. Stevens was in the severe stages of withdrawal – the presumed diagnoses of the health care providers at the Detention Center, given the treatment protocols issued – the protocol for a patient with a CIWA-Ar score of 19 still calls for hospitalization. Indeed, the Federal Bureau of Prisons advises that when an inmate with hypertension or congestive heart failure has a CIWA-Ar score above 15 or exhibits severe symptoms of withdrawal, hospitalization is strongly suggested.

100.     Defendant Logsdon did not take Mr. Stevens to the hospital for emergency care or evaluation by a physician.

101.     Instead, at 1:05 a.m., Defendant Logsdon contacted Defendant James Piazza, a Physician's Assistant, and advised him of Mr. Stevens' status.

102.     On information and belief, Defendant Piazza did not come to the Detention Center to examine Mr. Stevens in-person, instruct Defendant Logsdon to take Mr. Stevens to the hospital, or review his medical history from WMHS. At that point, Mr. Stevens' heart had never been assessed by electrocardiogram, x-ray, ultrasound, or other common diagnostic equipment. His blood was not drawn or tested, his leg wound was never examined, and he was not assessed for sepsis.

103.     Instead, Defendant Piazza ordered an increase in Mr. Stevens' prescription for Lisinopril, which he was taking to prevent a heart attack, from 20 mg to 40 mg a day. At or around 1:05 a.m., Mr. Stevens was given a dose of Lisinopril.

104.     Defendant Logsdon also gave Mr. Stevens 10 ounces of Gatorade, a cool cloth for his forehead, and extra blankets to prop up his head.

105.     On information and belief, Defendant Logsdon offered Mr. Stevens additional medications, but he refused. She offered him a Phenergan suppository; Phenergan is used to treat allergic reactions and nausea, and a Phenergan suppository is for rectal administration only. Mr. Stevens stated, "stuff comes out of there, doesn't go in." She encouraged him to reconsider. Defendant Logsdon offered Mr. Stevens "his 02" but he rejected that, too.

106.     Per its own regulations, the "Detention Center will ensure that emergency medical care is available 24 hours per day for inmates, staff, visitors, etc.: that there is ready access to hospitals, clinics, and medical centers; that a physician is on-call; and that first aid kids approved by qualified healthcare personnel are available within the detention center for medical emergencies."

107.     Those regulations further provide that "[w]hen a medical emergency exists, the Shift Supervisor and Medical Department will be notified and will respond to the emergency."

108.     In responding to an emergency, Defendants Logsdon and Piazza, as well as Defendants Holler, Shroyer, Manger, Shutts and Brashear, could authorize an emergency room visit for any inmate at the Detention Center. The Detention Center's "Emergency Medical Services" Regulation states: "Under the recommendation of certified healthcare personnel, the Shift Supervisor may authorize transporting the inmate out of the facility for emergency care." Another Regulation states: "If it is determined by a certified healthcare professional that an inmate's condition is serious enough to warrant transportation of an inmate via ambulance rather than

departmental vehicle, the CCO [Chief Correctional Officer] will call EMC and request an ambulance to be dispatched to the facility."

109.    Defendants Holler, Shroyer, Manger, Logsdon, Piazza, Shutts and Brashear have a duty to exercise their authority to call an ambulance and/or transmit an inmate to the hospital when an inmate needs emergency care. A Detention Center Regulation states that all matters of medical judgment will be deferred to a qualified health care provider. Indeed, a webpage on the Allegany County website that pertains to the Detention Center advises: "All out of facility appointments . . . have to be approved by CCS before we can send the inmate out."

110.    On information and belief, the $969,879 set aside by Defendant County Commissioners for its contract with Defendant Correct Care Solutions did not cover inmate visits to the emergency room. Defendant Correct Care Solutions must pay those expenses up front and out of pocket and then seek reimbursement from the Sheriff. An addendum to the 2019 Request For Proposals to provide medical care at the Detention Center states that the Detention Center is responsible for reimbursing the contractor for inmates' medical bills initially paid by that contractor.

111.    However, Allegany County Code states: "The Sheriff shall not be entitled to any compensation for the removal of inmates from the Detention Center to any other place" unless upon Court order or the inmate's release. Pub. Local Laws, Allegany Co. § 160-1(C).

112.    Accordingly, on information and belief, Defendant Captain Cutter, with encouragement, authority and ratification from Defendants County Commissioners

and Sheriff Robertson, has adopted policies and practices to minimize the hospitalization of inmates at the Detention Center in order to keep costs low. At an official meeting of the County Commissioners on September 7, 2017, the minutes reflect that Commissioner Jacob Shade, in considering whether to renew the 2016 contract with Correct Care Solutions, asked how "Allegany County Detention Center has worked to keep costs down." According to the minutes,

> Captain Cutter replied that there are several ways that costs are kept down. First, he said to keep in mind that there is 24/7 coverage on the medical contract at the Detention Center, and it includes dental, psychiatry, and counseling, which keeps a lot of the costs down, because most medical services are handled in-house. He pointed out that there are very few transports out of the facility, resulting in fewer hospital bills for the Detention Center and also for the contractor.

113.   Defendant Captain Cutter has similarly expressed his conservative approach to matters of inmate care to the media. For example, in negotiating the $969,879 contract between Defendants County Commissioners and Correct Care Solutions that was in place at the time of Mr. Stevens' detention, Defendant Captain Cutter told the Cumberland Times-News that the budget was kept down "due to 'fine tuning' on his part. 'It has to read exactly how you want it,' said Cutter, 'because you are basically taking just under $1 million of taxpayer money and I have to treat that as if it's my own money – actually I treat that money more tightly than I treat my own money because it is taxpayer money. I owe it to the taxpayer to negotiate the best deal I can for the county." In that same article, he told the outlet, with regards to sick inmates: " '[j]ust because they're ill, or just because they're sick, or have some kind of disease – you can't just let them out[,]' said Cutter."

114.     On information and belief, Defendant Correct Care Solutions is aware of and has adopted Defendants Captain Cutter, Sheriff Robertson, and County Commissioners' policy of keeping inmate care in-house as much as possible.

115.     In 2016, statistics from Correct Care Solutions show there were only four inpatient admissions to a hospital that year and only 12 emergency room visits, none of which were made by ambulance. In November, the month of Mr. Stevens' detention and death, the average daily population was 158; whereas fewer than 200 inmates generated 1,221 on-site visits for sickness, physicals, wound care, and other treatments, there were zero emergency room visits that month.

116.     Statistics from 2017 and 2018 show a similar pattern. Between 2016 and 2018, the average number of emergency room visits for inmates at the Detention Center in a single month was 1.4.

117.     Mr. Stevens never received emergency care and instead remained at the Detention Center over the next three days. The medical crisis that emerged on November 25 and became acutely dangerous in the early morning of November 26 persisted until his release and ultimately led to his death.

118.     At 6:00 a.m. on Saturday, November 26, Mr. Stevens was assessed by Defendant Logsdon. He was still very ill. His CIWA-Ar and COWS scores were unchanged, and his level of vomiting, sweating, agitation, disturbances, anxiety and aches had not gone down since the early morning.

119.     Defendant Logsdon still did not call a physician or take Mr. Stevens to the emergency room.

120.     Two hours later at 8:00 a.m., Defendant Shutts administered Librium.

121.     At 8:55 a.m., Mr. Stevens was re-assessed. His resting pulse rate had increased by 10 points since his last evaluation, and his respirations were still very high at 25. Although his CIWA-Ar and COWS scores had gone down, he continued to exhibit the aforementioned symptoms, like vomiting and sweating.

122.     By late afternoon, Defendant Shutts determined that Mr. Stevens had stabilized. Her notes indicate that Mr. Stevens' oxygen saturation level was 95%, he was taking his medication without dysphasia, the vomiting had stopped, and he was no longer disoriented.

123.     However, Defendant Shutts also noted that Mr. Stevens was "not eating well, only a few bites."

124.     At 5:00 p.m., Defendant Shutts re-assessed Mr. Stevens. He still had a high respiration rate of 25, thus still had tachypnea, and his pulse rate had increased yet again to 100. His blood pressure, while stable at that moment, had fluctuated substantially over the last 40 hours, getting as high as 190 over 112, and as low as 118 over 98. He was still exhibiting symptoms of nausea, sweating and anxiety.

125.     Defendant Shutts did not consult a physician or physician's assistant about Mr. Stevens' change in status.

126.     A few hours later at 8:54 p.m., Mr. Stevens' vital signs and withdrawal scores were relativity unchanged, but his respiration rate had jumped to 28, the highest of his detention.

127.     On information and belief, Defendant Shutts took no action in response to Mr. Stevens' increased respiration rates.

128.     Sometime after 8:54 p.m. but before the next morning, Defendant Shroyer determined that Mr. Stevens would no longer be monitored for opiate withdrawal.

129.     By the next morning, Sunday November 27, 2016, at 9:10 a.m., Mr. Stevens had not improved. While he was vomiting, sweating, and agitated to a lesser degree than the morning before, his CIWA-Ar score started to go back up; it increased by one point. His systolic blood pressure was up from 133 to 179, his pulse rate went from 99 to 107, and he still had an elevated respiration rate (tachypnea) of 26.

130.     Throughout the day, Mr. Stevens was monitored and given medication and insulin. But on information and belief, no physician was contacted.

131.     By the evening, Mr. Stevens worsened yet again. At 8:58 p.m., Defendant Shutts found Mr. Stevens lying in his bottom bunk "soaked in his own urine." Although his blood pressure and pulse rate had dropped, and he could ambulate, he was more anxious and disoriented than he had been a few hours before. Accordingly, his CIWA-Ar score increased by another two points.

132.     On information and belief, Defendant Shutts did not contact a physician. She also did not take him to the emergency room.

133.     Instead, Defendant Shutts gave Mr. Stevens Tums and Gatorade, as he requested, and helped him into a new set of clothes.

134.     And at this point, on information and belief, Defendants Holler, Shroyer,
Manger, Logsdon, Piazza, Shutts and Brashear still had not examined Mr. Stevens'
leg wound or attempted to rule out whether he was septic or having a heart attack.
Instead, actions taken by Defendants Holler, Shroyer, Manger, Logsdon, Piazza,
Shutts and Brashear strongly suggest that they were anchored solely to the diagnosis
of substance withdrawal and did not meaningful explore any other kinds of diagnoses.

135.     Over the next 12 hours, Mr. Stevens seemed to stabilize somewhat. He
was observed through the night and did not have distressed breathing, nor was he
vomiting.

136.     However, at 6:30 a.m. on Monday, November 28, 2016, Mr. Stevens
refused a meal and chose to stay laying down in his bunk. By 9:12 a.m., his
temperature was up to 99.8 degrees.

137.     Over the next five hours, five other inmates made bond and/or were
released. Mr. Stevens, however, remained in his cell, resting in his bunk.

138.     At 2:30 p.m., Defendant Shroyer reported that Mr. Stevens "smelled
strongly of urine and body odor" and advised the correctional staff that Mr. Stevens
needed a shower. He was clearly still unwell and disoriented.

139.     Approximately 20 minutes later, Mr. Stevens was showered. He was so
ill that he needed assistance from a correctional officer, who reported that Mr.
Stevens was short of breath during the shower.

140.     Around this time, Defendant Shroyer spoke on the phone with Mrs.
Stevens. Mrs. Stevens had called the Detention Center and told Defendant Shroyer

that she would bring in her husband's C-PAP machine and testosterone medication. She also offered to take home any unapproved medication and equipment. She also asked about his health status.

141. On information and belief, Defendant Shroyer did not consult with a physician or other health care provider regarding Mrs. Stevens' offer to bring additional medication and equipment to the Detention Center to help her husband.

142. Also on information and belief, Defendant Shroyer did not share any information regarding Mr. Stevens' health status with his wife.

143. At 3:50 p.m., Defendant Brashear and another licensed practical nurse were called to the Booking Department, because Mr. Stevens had been short of breath during his shower.

144. That evening, Mr. Stevens was transported from the Detention Center to the Circuit Court for Allegany County for his bail hearing.

145. On information and belief, Mr. Stevens was visibly listless and confused throughout the hearing.

146. At 7:11 p.m., Mr. Stevens posted a $5,000 bond, and the Court ordered his release. Mr. Stevens returned to the Detention Center.

147. At no time during the transports to and from court was Mr. Stevens taken to a hospital for evaluation.

148. Per Detention Center Regulations, inmates receiving medical care should be examined before their release.

149. On information and belief, Mr. Stevens was not examined before release.

150.     Instead, Defendant Brashear asserted, without any supporting facts, that Mr. Stevens was stable.

151.     Defendant Brashear did not impress upon Mr. Stevens the nature of his condition or specify any particular follow up care. Instead, she advised him to follow up with his primary care providers or local emergency room "for any issue."

152.     Defendant Brashear also did not advise Mrs. Stevens about Mr. Stevens' health status or inform her about any of the medical distress he had experienced. Defendant Brashear did not advise Mrs. Stevens to take Mr. Stevens to the hospital.

153.     At the time of his final screening, Mr. Stevens was still noticeably listless and unwell. His signature on the Continuity of Care form is distinctly sloppier than the signature that appears on his reception screening records.

154.     At 8:00 p.m. on November 28, 2016, Mr. Stevens was released from the Detention Center. He came in on his own two feet, but after four full days in custody, Mr. Stevens had to be escorted out to his wife's car in a wheelchair.

155.     Mrs. Stevens recognized that Mr. Stevens was unwell and made an appointment for Mr. Stevens at his primary care provider, Western Maryland Health Center, for Wednesday morning, November 30, 2016. It was the earliest appointment available after Mr. Stevens' release.

156.     However, Mrs. Stevens lacked the medical knowledge, training and skill to recognize the severity of Mr. Stevens' condition in light of his comorbid conditions. Moreover, she was unaware of what had happened over the last four days. Had she been advised to do so, she would have taken Mr. Stevens to the hospital immediately.

157.     The next morning, Tuesday, November 29, 2016, Mr. Stevens woke up in his home still unwell and disoriented. He asked Mrs. Stevens to prepare food for him, saying "maybe it will absorb whatever they gave me."

158.     Mrs. Stevens sat down next to her husband and rested her hand on his leg, but he was too disoriented to register her touch. Mr. Stevens asked, "where you at? Where you at?" as though he did not understand that she was right beside him.

159.     Mrs. Stevens was worried about her husband, but she knew he had his appointment scheduled. Furthermore, she had a meeting that afternoon that she was legally obligated to attend. Mrs. Stevens hesitantly went to her meeting.

160.     Mrs. Stevens returned home at or by 5:11 p.m. and found Mr. Stevens dead. It had been less than 20 hours since his release from the Detention Center.

161.     A partial autopsy was performed. The medical examiner determined that Mr. Stevens' cause of death was Hypertensive Heart Failure.[9]

162.     Per a Toxicology Report, Mr. Stevens' blood tested positive for chlordiazepoxide (Librium) and a small amount of Nordiazepam, to which Librium is metabolized. No other drugs or alcohol were found in his system.

163.     On December 1, 2016, Mrs. Stevens went to the Detention Center to get records pertaining to Mr. Stevens' detention. The staff avoided eye contact with her.

164.     On information and belief, one of the nurses charged with Mr. Stevens' care and at least one correctional officer made comments during Mr. Stevens'

---

[9] The Medical Examiner also opined that Obesity and Diabetes Millitus were contributing causes of death.

detention indicating that they knew he was fatally ill and wanted him released from the Detention Center as soon as possible, so he would not die inside the facility. These comments were overheard by a third party and later recounted to Mrs. Stevens.

## CAUSES OF ACTION

### COUNT 1
**Estate of James Stevens Against Dawn Holler, LPN, Stephanie Shroyer, RN, Dr. Donald Frederick Manger, Leslie Logsdon, RN, James Piazza, PA, Lisa Shutts, LPN, and Jodi Brashear, LPN (the "Medical Defendants")
42 U.S.C. § 1983**

165.     Plaintiff incorporates by reference the allegations made in the preceding paragraphs.

166.     At all times alleged in this Complaint, the Medical Defendants were acting under color of law.

167.     As a pretrial detainee, Mr. Stevens had the right under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution to receive adequate and necessary medical care.

168.     Because the Board of County Commissioners for Allegany County procured Correct Care Solutions to provide medical care at the Allegany County Detention Center, and Sheriff Robertson and Captain Cutter had delegated all matters of medical judgment regarding inmate care to qualified health care personnel at the Detention Center, the Medical Defendants had a duty to provide Mr. Stevens with the requisite medical care guaranteed by the Fourteenth Amendment.

169.     The Medical Defendants violated Mr. Stevens' Fourteenth Amendment rights to medical care when they were deliberately indifferent to his serious medical needs.

170.     Mr. Stevens had congestive heart failure, hypertension, asthma, diabetes, and morbid obesity, all of which had been diagnosed by a physician and mandated treatment. Those medical disabilities, as well as his substantial drug use, rendered Mr. Stevens predisposed to heart attack, sepsis, and withdrawal, and would be exasperated by all of those stressful conditions. During his detention, Mr. Stevens' vomiting, disorientation, high blood pressure and respiration rates, uncontrolled urination, anxiety, and sweating were so obvious and persistent that a layperson would have recognized his need for emergency care.

171.     Each of the Medical Defendants knew Mr. Stevens (a) had heart disease, hypertension, asthma, diabetes, morbid obesity, and a history of drug use; (b) was experiencing multiple and sustained episodes of vomiting, sweating, feeling anxious, urinating on himself, and disorientation that were indicators of heart attack, sepsis, and/or withdrawal; (c) had unstable and wildly fluctuating vital signs throughout his detention, including alarmingly high systolic blood pressure and respiration rates, and fluctuating oxygen saturation levels and pulse rates; (d) was in pain; (e) was at greater risk of heart attack if not carefully monitored, accurately diagnosed, or given proper medical attention; and (f) could not be diagnosed or treated for a heart attack or sepsis at the Detention Center.

172.     Each of the Medical Defendants knew the risks of (a) failing to have him examined by a physician; (b) allowing Mr. Stevens to experience intense physical stress, whether through withdrawal or another condition, outside of a hospital setting and without sophisticated monitoring equipment; (c) prescribing a new medication to a patient with his profile and history; and (d) not taking him to the hospital during or immediately after multiple episodes of acute distress.

173.     Each of the Medical Defendants recklessly disregarded those risks by (a) formulating a treatment plan for Mr. Stevens without an in-person evaluation by a physician; (b) not examining his leg wound and source of reported pain; (c) ordering that Mr. Stevens be treated for withdrawal absent a history of serious withdrawal; (d) prescribing Librium, even though it was not the preferred medication for a patient of Mr. Stevens' weight and history, and it could exasperate his heart conditions; (e) continuing to administer Librium after Mr. Stevens experienced a negative reaction; (f) failing to diagnose whether Mr. Stevens was having a heart attack or had sepsis; and (g) not ordering Mr. Stevens be hospitalized when he needed emergency care.

174.     Each of the Medical Defendants recognized that their actions were not sufficient, as Mr. Stevens' condition was so high-risk and noticeably troubling that Detention Center personnel took steps to shorten the length of his detention, Defendant Logsdon consulted Defendant Piazza about Mr. Stevens' second episode of distress, Defendant Piazza ordered an increase in Mr. Stevens' heart medication, Mr. Stevens deteriorated and never meaningfully stabilized under Defendants Holler's, Shroyer's, Logsdon's, Shutts' and Brashear's care, he had multiple episodes of

distress during his detention, Defendants were overheard making comments about Mr. Stevens imminent death and their desire to have him die outside the facility, Mr. Stevens was visibly listless at his bond hearing, Mr. Stevens' signature was distinctly sloppier upon his release than at intake, and Mr. Stevens needed a wheelchair.

175.    As a result of the Medical Defendant's deliberate indifference to Mr. Stevens' serious medical needs, Mr. Stevens needlessly deteriorated and died.

176.    Each of the Medical Defendants were acting under color of law at the time of his or her deliberately indifferent acts and omissions.

177.    Because the Medical Defendants, acting under color of law and with deliberate indifference for Mr. Stevens' serious medical need, violated Mr. Stevens' Fourteenth Amendment rights, Plaintiff, as personal representative of Mr. Stevens' Estate, is entitled to damages.

**COUNT 2**
**Estate of James Stevens Against Sheriff Craig Robertson and Captain R. Lee Cutter, *in their official capacities*, and Board of County Commissioners for Allegany County, Maryland 42 U.S.C. § 1983 - *Monell* claim**

178.    Plaintiff incorporates by reference the allegations made in the preceding paragraphs.

179.    Sheriff Craig Robertson is the final policymaker concerning law enforcement and pretrial detention of inmates in Allegany County.

180.    Sheriff Craig Robertson, in operating the Allegany County Detention Center using funds, vendors and property all selected and supplied by the Board of County Commissioners, and adopting Detention Center Regulations that both govern

when an inmate may be transported to a hospital and expressly state that the Sheriff serves the citizens of Allegany County, Maryland, acts as an official of Allegany County and the final repository of county authority.

181.     Captain R. Lee Cutter, in serving under Sheriff Robertson as Assistant Administrator of the Detention Center, negotiating the contract between the Board of County Commissioners and Correct Care Solutions regarding the provision of medical care to inmates at the Detention Center in 2016, attempting to get the best deal "for the county" in that transaction, and overseeing the daily provision of care to inmates by employees of Correct Care Solutions, a County contractor, using County-owned equipment, acted as an Allegany County official.

182.     It is Detention Center policy, practice and custom to provide medical care of inmates in-house and limit the number of transports of inmates to hospitals. It is also Detention Center policy to not have any physician present at the facility and instead only provide remote access to doctors who act as independent contractors when they consult with nurses at the Detention Center about an inmate's care

183.     Captain Cutter was acting as administrator of the county jail and with authority from the Board of County Commissioners when he publicly discussed the policy, practice and custom of limiting the transport of inmates at the Detention Center to hospitals and emergency rooms as a cost-saving mechanism.

184.     The Board of County Commissioners, in enacting ordinances pursuant to its Home Rule authority to restrict the Sheriff's ability to budget for certain expenditures at the Detention Center, such as the transport of inmates off-site, and

approving and entering the agreement with Correct Care Solutions based on guarantees from Captain Cutter regarding certain cost-saving practices employed at the Detention Center, has ratified Captain Cutter's policy, practice and custom of discouraging and/or minimizing the hospitalization of inmates.

185.     The Board of County Commissioners was aware that medical emergencies were common at the Detention Center. In September of 2017, less than one year after Mr. Stevens' death, Defendant Captain Cutter told the Board of County Commissioners "that approximately 70% of the individuals who come into the facility are detoxing from some type of drug abuse or alcohol abuse."

186.     The Medical Defendants, in working at the Detention Center pursuant to a contract authorized and funded by the Board of County Commissioners, were acting as agents of Allegany County when they were deliberately indifferent to Mr. Stevens' medical needs.

187.     The Medical Defendants' deliberate indifference to Mr. Stevens medical needs arose out of the County's policy, practice and custom, as expressed and implemented by Captain Cutter, of minimizing hospitalization of inmates to save money and not having any medical doctors on site or guidelines for when they must come to the facility.

188.     Correct Care Solutions and its employees, including the Medical Defendants, provided service consistent with the County's custom and preferences. By 2016, the Board had a long history of doing business with Correct Care Solutions. At a County Commissioners' meeting on August 20, 2015, the Board authorized

renewal of an agreement with CONMED, Inc. to provide medical services at the Detention Center from July 2015 to June 2016, the term that preceded Mr. Stevens' detention. Captain Cutter "told the Commissioners that the Detention Center has been with CONMED for over ten years now." Back in 2012, CONMED was acquired by Correct Care Solutions. Thus, the Board had been procuring services from Correct Care Solutions, doing business as CONMED, for several years prior to Mr. Stevens' death. That relationship would not have persisted but for Correct Care Solution's ability to comply with County policy, practice and custom.

189.    Likewise, the Medical Defendants were subject to the policies, practices and customs adopted and implemented by Sheriff Robertson and Captain Cutter. The Standard Operating Procedures for the Detention Center provide "the general responsibilities and standards of conduct expected of all employees." On information and belief, the term "employees" in that context included the Medical Defendants.

190.    Accordingly, pursuant to *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978), Sheriff Robertson, Captain Cutter, and the Board of County Commissioners are liable for the Medical Defendants' violations of Mr. Stevens' constitutional rights under the Fourteenth Amendment.

### COUNT 3
### Estate of James Stevens Against Board of County Commissioners
### Article 24 of the Maryland Declaration of Rights – *Respondeat Superior*
### Liability For The Medical Defendants' State Constitutional Violations

191.    Plaintiff incorporates by reference the allegations made in the preceding paragraphs.

192.     Under Article 24 of the Maryland Declaration of Rights, Mr. Stevens had the right not "to be taken or imprisoned or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or, in any manner, destroyed, or deprived of his life, liberty or property, but by the judgment of his peers, or by the Law of the land." Article 24 is to be read in *pari materia* with the Fourteenth Amendment to the U.S. Constitution.

193.     By violating Mr. Stevens' Fourteenth Amendment rights as described *supra*, Count 1, when acting under color of law and as agents of Allegany County, the Medical Defendants also violated Mr. Stevens' rights under Article 24 of the Maryland Declaration of Rights.

194.     The Board of County Commissioners is liable under the *respondeat superior* doctrine for the Medical Defendants' violations of Mr. Stevens' state constitutional rights that occurred while they were acting as agents of the County and pursuant to County policies, practices and customs.

195.     As described *supra*, paragraph 19, Plaintiff has complied with all notice requirements under the Local Government Tort Claims Act.

196.     Plaintiff, as personal representative of Mr. Stevens' Estate, seeks damages for these violations.

## COUNT 4
**Estate of James Stevens Against Craig Robertson and R. Lee Cutter, *in their individual capacities*, and Board of County Commissioners Article 24 of the Maryland Declaration of Rights – *Longtin* claim**

197.     Plaintiff incorporates by reference the allegations made in the preceding paragraphs.

198.    The Medical Defendants, in providing medical care to Mr. Stevens while he was at the Detention Center, were subject to the policies and practices of Craig Robertson and R. Lee Cutter, the officials tasked with operating the Detention Center and serving at the top of the chain at command at that facility, respectively.

199.    By adopting and implementing of policies and practices that minimize the hospitalization of inmates at the Allegany County Detention Center, Defendants Robertson and Cutter caused the Medical Defendants to take actions against, and fail to take actions for, Mr. Stevens that deprived him of necessary medical care and violated his rights under Article 24 of the Maryland Declaration of Rights.

200.    Because the Board of County Commissioners encouraged and ratified the policies and practices that were adopted and implemented by Defendants Robertson and Cutter and caused the Medical Defendants' unconstitutional acts and omissions against Mr. Stevens, the Board of County Commissioners is directly liable pursuant to *Prince George's County v. Longtin*, 419 Md. 450, 19 A.3d 859 (2011) for those unconstitutional patterns and practices.

201.    Because Defendants Robertson and Cutter were acting with County authority in adopting those policies and practices that caused the Medical Defendants' unconstitutional acts and omissions against Mr. Stevens, the Board of County Commissioners is also liable under the *respondeat superior* doctrine for the acts and omissions of Defendants Robertson and Cutter in adopting those unconstitutional policies and practices.

202.      Plaintiff, as personal representative of Mr. Stevens' Estate, seeks damages for these violations.

## COUNT 5
### Estate of James Stevens Against the Medical Defendants
### Survival Action – Negligence

203.      Plaintiff incorporates by reference the allegations made in the preceding paragraphs.

204.      Defendants had a duty to care for Mr. Stevens as reasonably prudent health care providers would under similar circumstances.

205.      The Defendants breached the standard of care owed to Mr. Stevens when they were deliberately indifferent to Mr. Stevens' medical needs, failed to properly evaluate him and formulate a course of action to mitigate and prevent complications posed by high-risk medical disabilities, and disregarded his obvious need for emergency medical intervention.

206.      The actions and omissions of the Medical Defendants directly caused Mr. Stevens to feel distress, suffer pain, and ultimately die. But for their conduct, Mr. Stevens would have been hospitalized and received emergency medical intervention during his detention. Had he been treated sooner, he would have lived.

207.      The actions and omissions of the Medical Defendants were the proximate cause of Mr. Stevens' distress, pain, and death. It was foreseeable that Mr. Stevens faced serious harm if he was not thoroughly evaluated, properly monitored, and provided access to emergency care during a medical crisis.

208.      Thus, the Defendants were negligent under Maryland's common law.

209.     Accordingly, Plaintiff, as personal representative of Mr. Stevens' Estate, is entitled to damages.

## COUNT 6
### Plaintiff Shelly Stevens Against the Medical Defendants
### Wrongful Death

210.     Plaintiff incorporates by reference the allegations made in the preceding paragraphs.

211.     The wrongful, deliberately indifferent, negligent and unconstitutional acts and omissions of the Defendants, proximately caused Mr. Stevens' death.

212.     As a direct result of Mr. Stevens' untimely death, Plaintiff sustained pecuniary loss, mental anguish, emotional pain and suffering, loss of consortium, companionship, comfort, protection, marital care, and other noneconomic damages.

213.     Plaintiff was married to the Decedent and is a primary beneficiary in this action pursuant to Section 3-904(a) of the Courts and Judicial Proceedings Article of the Maryland Annotated Code.

214.     This action is brought within the three year statutory period applicable to actions brought under the Wrongful Death Act.

215.     Accordingly, Plaintiff is entitled to damages for her injuries.

## COUNT 7
### Plaintiff Shelly Stevens and Estate of James Stevens Against Wellpath
### *Respondeat Superior* Liability for Negligence and Wrongful Death of
### Defendants Holler, Shroyer, Logsdon, Shutts, and Brashear

216.     Plaintiff incorporates by reference the allegations made in the preceding paragraphs.

217.     As employer of Defendants Holler, Shroyer, Logsdon, Shutts and Brashear, Wellpath is vicariously liable under the doctrine of *respondeat superior* for the tortious conduct of its employees.

218.     Accordingly, Plaintiff, as personal representative of Mr. Stevens' Estate, is entitled to damages.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays this Court enter judgment against the Defendants, and grant:

A. Damages to the Estate of James Stevens for injuries and losses Mr. Stevens suffered due to the negligent and/or deliberately indifferent acts of the Defendants, jointly and severally, in an amount to be determined at trial;

B. Damages to Plaintiff Shelly Kaye Stevens for the negligent and/or deliberately indifferent acts of the Defendants; in an amount to be determined at trial;

C. Attorneys' fees and the costs associated with this action under 42 U.S.C. § 1988, including expert witness fees, on all claims as allowed by law; and

D. Any further relief that this Court deems just and proper, and any other appropriate relief available at law and equity.

Date: November 22, 2019

Respectfully submitted,

/s/
_____
Charles N. Curlett, Jr. (Fed Bar #28246)
Lauren McLarney (Fed Bar #20982)
Rosenberg Martin Greenberg, LLP
25 S Charles Street 21st Floor
Baltimore, Maryland 21201
Phone: (410) 727-6600
ccurlett@rosenbergmartin.com
lmclarney@rosenbergmartin.com
*Attorneys for Plaintiff Shelly Stevens*

## **REQUEST FOR TRIAL BY JURY**

Plaintiff requests a trial by jury.

/s/
_____
Lauren McLarney

Date: November 22, 2019