**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **SHELLY KAYE STEVENS** | |
| *Plaintiff,* | |
| v. | **Civil Action No.** 1:19-cv-03368-JMC |
| **BOARD OF COUNTY COMMISSIONERS FOR ALLEGANY COUNTY,** *et al.* | |
| *Defendants.* | |

## PLAINTIFF'S RESPONSE TO THE GOVERNMENTAL DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Lauren McLarney (Fed Bar #20982)
Charles N. Curlett, Jr. (Fed Bar #28246)
Rosenberg Martin Greenberg, LLP
25 S. Charles St. 21st Floor
Baltimore MD 21202
Phone: (410) 727-6600
lmclarney@rosenbergmartin.com
ccurlett@rosenbergmartin.com

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................ 1

LEGAL STANDARD..................................................................................... 1

ARGUMENT .................................................................................................. 3

    I.      COUNTS 2 AND 4 (*MONELL* AND *LONGTIN*) ........................................ 3

        A. BECAUSE THE AMENDED COMPLAINT ALLEGES STATEMENTS, STATISTICS, AND MULTIPLE INSTANCES OF MISCONDUCT, PLAINTIFF HAS SUFFICIENTLY PLED A CUSTOM OF DELIBERATE INDIFFERENCE NECESSARY FOR MUNICIPAL LIABILITY ............................................................................................. 4

             i.  STATEMENTS ............................................................................. 9
           ii.  STATISTICS .................................................................................. 11
         iii.  COUNTY POLICY AND PROCUREMENT............................... 12
         iv.  WRITTEN POLICIES ................................................................... 20
          v.  SUBJECTIVE KNOWLEDGE ..................................................... 21
         vi.  MEDICAL JUDGMENT................................................................ 24

        B. THE AMENDED COMPLAINT CONTAINS DETAILED DESCRIPTIONS OF MULTIPLE INSTANCES OF MISTREATMENT AND AN EXPERT REPORT EXPLAINING THAT THE MEDICAL DEFENDANTS' FAILURE TO HOSPITALIZE MR. STEVENS CAUSED HIS DEATH, THUS PLAINTIFF HAS SUFFICIENTLY PLED A CAUSAL LINK BETWEEN THE ALLEGED CUSTOM AND MR. STEVENS' DEATH ...................................................................... 26

    II.     COUNT 3 (*RESPONDEAT SUPERIOR*) ................................................... 29

CONCLUSION................................................................................................ 34

# TABLE OF AUTHORITIES

**Case**                                                                                    **Page**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)............................................................. 1, 2, 11, 16

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................1

*Thornhill v. Aylor*, No. 3:15-CV-00024, 2016 WL 8737358, at *5
(W.D. Va. Feb. 19, 2016)................................................................. 2, 11, 12, 13, 14, 15

*Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012).....2

*Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).......................4

*Rosa v. Bd. Of Educ. of Charles County, Md.*, 8:11-CV-02873-AW, 2012 WL
3715331, at *9 (D Md. Aug. 27, 2012) ..............................................................3

*Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379
(4th Cir. 2014) ............................................................... 4, 5, 8, 18, 23, 26, 29

*Dotson v. Chester*, 937 F.2d 920 (4th Cir. 1991) ............................................17, 18

*Thornhill for Estate of Berry v. Aylor*, No.3:15CV00024, 2017 WL 4685986,
at *9 (W.D. Va., Oct. 18, 2017) ....................................................................... 13, 22, 27

*Durham v. Somerset County,* No. WMN–12–2757, 2013 WL 1755372, at *3
(D. Md. Apr. 23, 2013) ......................................................................................16

*Hanlin-Cooney v. Frederick County*, No. WDQ-13-1731, 2014 WL 57673,
at *12-*13 (D. Md. Feb. 11, 2014) ....................................................................16

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)......................................12, 20

*Santos v. Frederick County Board of Commissioners*, 346 F.Supp.3d 785
(D. Md. 2018)...................................................................................................18, 19

*Farris v. Moeckel*, 664 F.Supp. 881, 891 (D. Del. 1987) ..................................19

*Ram Ditta By & Through Ram Ditta v. Maryland Nat. Capital Park
& Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987)........................................19

*Randall v. Prince George's County, Md.*, 302 F.3d. 188 (4th Cir. 2002).........20, 21

*Ward v. City of Hobbs*, 398 F.Supp.3d 991 (D. N.M. 2019)..............................20

*Hunter v. City of New York*, 35 F.Supp.3d 310 (E.D.N.Y. 2014).......................20

*Shields v. Prince George's County*, No. GJH-15-1736, 2016 WL 4581327, at *9  (D. Md., Sept. 1, 2016) ............................................................22

*Slakan v. Porter*, 737 F.2d 368, 375 (4th Cir. 1984)........................................23

*Moses v. Stewart*, No. TDC-15-38752017 WL 4326008, at *5 (D. Md. Sept. 26, 2017) ...................................................................24

*Estelle v. Gamble*, 429 U.S. 97 (1976) ............................................................25

*James v. Ozmint,* No. 1:09-1351-HMH-SVH, 2010 WL 3169609, at *6 (D.S.C. July 13, 2010) ............................................................................25

*Miltier v. Boern*, 896 F.2d 848 (4th Cir. 1990)................................................26

*Gardner v. United States*, 184 F. Supp.3d 175 (D. Md. 2016)........................26

*DiPino v. Davis*, 354 Md. 18, 51-52, 729 A.2d 354, 372 (1999) ......................29, 33

*Green v. H & R Block, Inc.*, 355 Md. 488, 503, 735 A.2d. 1039, 1048 (1999)...30

*American Soc. of Mechanical Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556 (1982)................................................................................30

*Bradford v. Jai Medical Systems Managed Care Organizations, Inc.*, 439 Md. 2, 18-19, 93 A.3d 697, 707 (2014)........................................................30

*Prince George's County, Md. v. Morales,* No. 1308 Sept. Term, 2014, 2016 WL 4723437, at *18 (Md. Ct. Spec. Apps. Sept. 8, 2016) ........................30

*Debbas v. Nelson*, 389 Md. 364, 885 A.2d 802 (2005) .......................................31, 32

## INTRODUCTION

Contrary to the Motion filed by Defendants Board of County Commissioners for Allegany County ("the County" or "the Board"), Sheriff Robertson ("Robertson"), and Captain Cutter ("Cutter") (hereinafter "the Governmental Defendants"), the Amended Complaint sufficiently alleges that Robertson and Cutter adopted an unconstitutional custom of limiting the hospitalization of inmates at the Allegany County Detention Center ("ACDC"), and establishes a causal link between that custom and Mr. Stevens' death. Likewise, the Amended Complaint pleads facts sufficient to show that the Board ratified that policy by procuring Correct Care Solutions ("CCS"), the company that supplied the Medical Defendants who ultimately caused Mr. Stevens' death, in response to Cutter's advisement that most care is kept in-house and out-of-facility transports are few. Because the Amended Complaint makes plausible claims for municipal liability based on acts of County policymakers that proximately caused a constitutional injury, the claims against the Governmental Defendants should survive.

## LEGAL STANDARD

"Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). The pleading "does not need detailed factual allegations," but the standard "requires more than labels and conclusions[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007) (citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

"Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679, 129 S.Ct. 1937. But "[i]n ruling on a 12(b)(6) motion, all well-pleaded allegations in the complaint are taken as true and all reasonable factual inferences are drawn in the plaintiff's favor." *Thornhill v. Aylor*, No. 3:15-CV-00024, 2016 WL 8737358, at *5 (W.D. Va. Feb. 19, 2016) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).

The Fourth Circuit has clarified a plaintiff's burden at this stage:

> *Iqbal* and *Twombly* do not require a plaintiff to prove his case in the complaint. The requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset. A "complaint need not 'make a case' against a defendant or '*forecast evidence* sufficient to *prove* an element' of the claim. It need only '*allege facts* sufficient to *state* elements' of the claim."

*Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. 2012) (quoting *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342, 349 (4th Cir. 2005)) (emphases original).

# ARGUMENT

The Governmental Defendants have moved to dismiss the following claims:

- Count 2 *(Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658 (1978)), which is based on the unconstitutional custom at ACDC adopted by Robertson and Cutter, ratified by the County through its repeated procurement of CCS, and followed by the Medical Defendants when they treated Mr. Stevens;

- Count 3 (*Respondeat Superior*) for the Medical Defendants' violations of Mr. Stevens' rights under the Maryland Declaration of Rights; and

- Count 4 (*Prince George's County v. Longtin*, 419 Md. 450, 19 A.3d 859 (2011)) for the same custom and causal link alleged in Count 2.

For reasons set forth *infra*, the Governmental Defendants' Motion to Dismiss should be denied, and these three claims against them should proceed to discovery.

## I.     COUNTS 2 AND 4 (*MONELL* AND *LONGTIN*) [1]

The Governmental Defendants argue that the *Monell* and *Longtin* claims must fail because there is no proof of an unconstitutional policy or causal link between that policy and Mr. Stevens' death. But the Amended Complaint supplies adequate factual content to plausibly support both of those elements and satisfy the pleading standard.

---

[1] "*Longtin* claims are essentially Maryland's version of *Monell* claims." *Rosa v. Bd. Of Educ. of Charles County, Md.*, 8:11-CV-02873-AW, 2012 WL 3715331, at *9 (D Md. Aug. 27, 2012). As the Governmental Defendants point out, the *Monell* jurisprudence provides the controlling framework for a *Longtin* claim. *See* MTD at 29. Indeed, most of the Governmental Defendants' arguments for why the *Longtin* claim should be dismissed echo their arguments about the *Monell* claim. Accordingly, the arguments set forth in this section are mostly discussed in the context of *Monell* liability but apply with equal force to the *Longtin* claim.

**A. Because the Amended Complaint Alleges Statements, Statistics, Multiple Instances of Misconduct, and Clear Instances Of Ratification By The County, Plaintiff Has Sufficiently Pled A Custom of Deliberate Indifference And Condonation Necessary For Municipal Liability.**

The Governmental Defendants contend that Mrs. Stevens failed to plead the existence of a municipal policy to support municipal liability, but the Amended Complaint has ample factual allegations to satisfy the low standard for pleading an unwritten municipal policy in support of such claims.

"Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994) (footnote omitted) (citing *Spell v. McDaniel*, 824 F.2d 1380, 1387-88 (4th Cir. 1987)). But "section 1983 claims are not subject to a 'heightened pleading standard' paralleling the rigors of proof demanded on the merits." *Id.* (quoting *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993)). "There is no requirement that [the plaintiff] detail the facts underlying his claims, or that he plead the multiple incidents of constitutional violations that may be necessary at later stages to establish the existence of an official policy or custom and causation." *Jordan*, 15 F.3d at 339 (citing *Kohl v. Casson*, 5 F.3d 1141, 1148 (8th Cir.1993)); *see Owens v. Baltimore City State's Attorneys Office*, 767 F.3d 379, 403 (4th Cir. 2014). ("The recitation of facts need not be particularly detailed, and the chance of success need not be particularly high.").

In *Owens, supra,* the Fourth Circuit underscored the low threshold for meeting this standard. 767 F.3d at 404. There, an exoneree brought a *Monell* claim against Baltimore City, claiming that the Baltimore City Police Department (BCPD) had an unconstitutional policy of suppressing exculpatory evidence, and that policy led to his wrongful conviction. *Id.* at 402. The Complaint alleged only (1) "that '[r]eported and unreported cases from the period of time before and during the events complained of' establish that the BCPD had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions" and (2) "that 'a number of motions were filed and granted during this time period that demonstrate that [the BCPD] maintained a custom, policy, or practice to allow this type of behavior either directly or ... by condoning it, and/or knowingly turning a blind eye to it.'" *Id.* at 403.

The Court held that "Owens had pled sufficient factual content to survive Rule 12(b)(6) dismissal." *Id.* at 404. "Although prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Id.* at 403. Thus, "[t]he assertions as to 'reported and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a *Monell* claim." *Id.*

Consistent with *Owens,* trial courts in other circuits have found that alleged statements or repeated instances of potentially unconstitutional conduct were enough to satisfy the standard for pleading an improper policy under a *Monell* claim. *See, e.g. Peters v. Community Educ. Centers, Inc.,* No. 11-850, 2011 WL 5024282, at *4 (E.D. Penn. Oct. 19, 2011) ("Peters waited until the section entitled 'Count II' . . . to plead

the existence of an 'informal custom of recklessly ignoring the medical needs of prisoners throughout the prison facility.' Compl. ¶ 55. That statement, coupled with Peters' factual assertion that the Prison refused to move Peters to a lower bunk despite actual notice of his condition and after repeated reminders that his special needs pass had not been honored, adequately pleads the existence of a municipal custom…"); *Rave v. Board of Commissioners for County of Bernalillo*, No. CIV 17-0636 RB/LF, 2017 WL 3600452, at *6 (D. N.M. Aug. 18, 2017) (where pleading showed inmate with renal failure told booking officers, correctional officers (COs) and medical unit he needed dialysis but was ignored multiple times before getting to the ER, "Plaintiff has pleaded facts sufficient to show that the County has an informal policy, custom, or practice of not requiring COs to obtain medical help for inmates.").

Here, the Amended Complaint satisfies, indeed surpasses, this standard, as it sets forth multiple allegations that plausibly support finding a custom of minimizing hospitalization of ACDC inmates existed. Those facts include:

a. Even though the Medical Defendants and the Shift Supervisor were all authorized to order an inmate be transferred to the emergency room, Amended Compl. at 24 ¶ 108, *at least seven* individuals of differing degrees of medical skill, *see id*. at 5-7 ¶¶ 9-15, when faced with *at least four* different episodes in which Mr. Stevens needed emergency treatment, failed to transport him to the hospital. *See id*. at 20-23, 27-29, ¶¶88, 94-100, 102, 117-19, 124-25, 131-32.

b. Less than a year after Mr. Stevens' death, in deciding whether to procure CCS to provide medical care to inmates, Commissioner Shade asked how ACDC "has worked to keep costs down." *Id*. at 26 ¶ 112.

c. Cutter replied that there are several ways that costs are kept down. He explained "most medical services are handled in-house. He pointed out that there are very few transports out of the facility, resulting in fewer hospital bills for the Detention Center and also for the contractor." *Id*.

     1) Cutter is at the top of the ACDC chain of command. *Id.* at 5 ¶ 7.
     2) ACDC Regulations say Cutter "is subordinate to the Sheriff." *Id.*

d. In response to Cutter's explanation, the Board voted to procure CCS for another year of service at ACDC. *Compare id.* at 20 ¶ 85 n.7 (noting that statistics appear on Conmed letterhead), 5 ¶ 8 (CCS' Maryland office is affiliated with Conmed) *with id.* at 27 ¶ 116 (statistics from 2017 show CCS, d/b/a Conmed, was at ACDC).

e. The County has long contracted with CCS to provide care for inmates at ACDC. *See id.* at 39 ¶ 188.

     1) At the August 20, 2015 meeting of the Board of County Commissioners, the Board renewed its agreement with Conmed, to provide medical services at the Detention Center for the term that preceded Mr. Stevens' detention. Cutter told the Board that ACDC "has been with Conmed for over ten years." *Id.*
     2) In 2012, CONMED was acquired by CCS. *Id.*

f. Cutter told the Cumberland Times-News that he negotiated the CCS contract in place at the time of Mr. Stevens' detention with an eye for keeping costs down and, with regards to sick inmates, "you can't just let them out." *Id.* at 26 ¶ 113.

     1) In that interview, Cutter held himself out as a County official: "I owe it to the taxpayer to negotiate the best deal I can *for the county*." *Id.* (emphasis added).
     2) Cutter said he exercised authority over how that money is spent and was intentionally conservative in doing so: "It [the contract with CCS] has to read exactly how you want it,' said Cutter, 'because you are basically taking just under 1 million of taxpayer money and *I have to treat that as if it's my own money* – actually I treat that money *more tightly* than I treat my own money because its taxpayer money." *Id.* (emphasis added).

g. CCS is aware of and has adopted the County's preference for minimizing costs by keeping services in-house and limiting transports out of the facility. *Id.* at 27 ¶ 114.

     1) A website for ACDC advises: "All out of facility appointments . . . have to be approved by CCS before we can send the inmate out." *Id.* at 25 ¶ 109.

2) In 2016, CCS statistics show there were only four hospitalizations that year and only 12 emergency room visits. *Id.* at 27 ¶ 115.

3) In November of 2016, the month of Mr. Stevens' death, the average daily population was 158; whereas fewer than 200 inmates generated 1,221 on-site visits for sickness, physicals, wound care, and other treatments, there were zero emergency room visits that month. *Id.*

4) In September of 2017, months after Mr. Stevens' death, Cutter told the Board of County Commissioners "that approximately 70% of the individuals who come into the facility are detoxing from some type of drug abuse or alcohol abuse." *Id.* at 39 ¶ 185.

5) The Federal Bureau of Prisons warns that detoxification and withdrawal are stressors that may exacerbate medical decompensation. *Id.* at 19 ¶ 83.

6) But between 2016 and 2018, the average number of emergency room visits for inmates at ACDC in a single month was 1.4. *Id.* at 27 ¶ 116.

h. The County, aware that most medical care is kept in-house as a result of Cutter's statements (*see*, *supra*, item c), has not outfitted ACDC with equipment to provide emergency care to inmates.

1) Per an addendum to the 2019 Request for Proposals to provide care to inmates at ACDC, the County owns all medical equipment at the facility. *Id.* at 20 ¶ 86.

2) ACDC is not equipped to perform electrocardiograms *Id.* at 20 ¶ 87.

i. There is no indication that Robertson and Cutter, who were also aware that most medical care is kept in-house, require a doctor be present at ACDC.

1) There is no indication Dr. Manger was physically present at ACDC during Mr. Stevens' detention, given that his orders were verbal and documented by one of the other Medical Defendants and he maintained a private practice. *Id.* at 15-16 ¶ 59.

2) There is no ACDC Regulation requiring or guaranteeing that a physician will be present at the facility. *Id.* at 16 ¶ 60.

These factual allegations are more detailed than required and more substantial than the unnamed "cases" and "motions" referenced in *Owens*.

The Governmental Defendants ignore or try to neutralize most of these allegations, arguing that Cutter's statements "constitute the primary universe of factual allegations from which Plaintiffs assert the existence of a policy that limits hospitalizations of inmates" and claiming "there are zero other allegations from which the Court might possibly infer that the Sheriff propounded any policy..." MTD at 6, 23. Each attack on – or misrepresentation of – the Amended Complaint is addressed in turn, below.

### i. Statements

The Governmental Defendants argue that Mrs. Stevens truncated Cutter's quotes in an "effort to impute ominous meaning" to his statements. MTD at 23. There is nothing misleading about synthesizing documentary evidence so that only pertinent quotations are presented. The quote pulled from the minutes of the meeting of the Board of County Commissioners was pared down to include the part of Cutter's answer that dealt with keeping costs down, the gravamen of the alleged custom.[2]

As for the press article, the Governmental Defendants make a big deal out of the fact that the sentences after "you can't just let them out," – *You can't let them go, they're there for a reason. The courts put them there and only the courts can let them*

---

[2] The Governmental Defendants note that the meeting occurred ten months after Mr. Stevens' death, MTD at 5, but that does not change the inferences drawn from Cutter's compelling statements. Cutter's acknowledgement that "there are very few transports out of the facility" clearly reflects what had happened at ACDC in previous months and years. It is untenable to imply, as the Governmental Defendants do, that Cutter's characterization of the rate of out-of-facility transports at ACDC does not reflect what was happening at ACDC during Mr. Stevens' stay less than a year prior and thus cannot support the allegation that a custom of limiting hospitalizations of inmates existed at that time.

*out.* – was omitted from the Amended Complaint, but those omitted sentences do not change the message and subtext of the article and selected quotes. The overall message conveyed to the reporter and reader was that, in negotiating the contract with CCS, Cutter made a conscious and concerted effort to save money. From that, the Court can infer that medical care for inmates is provided through a lens of budgetary scrutiny. And the subtext of the sentence regarding sick inmates was that, in even discussing their care, Cutter's perspective is colored by custody, safety and financial concerns. There is no rational reason to believe the reporter asked, "why can't we just let sick inmates out?" It is reasonable to infer from Cutter's statements (as alleged *or* considered in their full context) that this conservatively operated facility finds ways to keep care in-house, even when – or perhaps especially when – inmates have a costly diagnosis. The omitted lines, which restate the obvious, would not change those inferences.

The Governmental Defendants try to neutralize those inferences by pointing out that the budget for ACDC was the second largest line item after salaries and benefits. MTD at 23. The *amount* of money budgeted for medical care of inmates does not undercut valid allegations regarding the context in which that money was budgeted (*e.g. how* it was earmarked, and *why* it was repeatedly given to CCS). That medical care at ACDC is such a large expenditure suggests it is budgeted very carefully and under scrutiny from County leadership at ACDC and on the Board. That suggestion is consistent with Commissioner Shade's question to Cutter, Cutter's response, and Cutter's statements to the press. In other words, the cost of providing

medical care is precisely why Cutter is so conservative with his oversight, and the County is incentivized to – and indeed does – use a contractor that keeps the amount of hospitalizations low.

## ii. Statistics

The Governmental Defendants dismiss all other allegations in the Amended Complaint, misrepresenting that Cutter's statements are the only allegations asserted to show the existence of a policy that limits hospitalization of inmates. But the Governmental Defendants acknowledge that Mrs. Stevens also cited statistics regarding hospital visits by inmates at ACDC. *See* Amended Compl. at ¶ 114, 115. Those statistics show that hospitalizations were rare and substantially less frequent than in-house treatment. The Governmental Defendants claim those allegations "supply no meaningful inferences" because they lack context, MTD at 6 n.5, but the Court may use such factual allegations "to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937, and "all reasonable factual inferences are drawn in the *plaintiff's* favor." *Thornhill*, 2016 WL 8737358 at *5 (emphasis added) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)).

The Governmental Defendants ignore the fact that Cutter also advised the Board that 70% of inmates are experiencing withdrawal – a condition that is not only hazardous in its own right but likely to mask or exacerbate other high-risk or fatal conditions. Yet at the same time, he told the Board that transports to hospitalizations were rare, and the Board renewed its contract with CCS in response to that

information. Moreover, the Governmental Defendants ignore that the Board made this decision even though there is no electrocardiogram at ACDC, and the facility is not equipped to handle a heart attack. The Governmental Defendants ignore the longstanding history between CCS and the County. They ignore the compelling fact that multiple CCS workers failed to hospitalize Mr. Stevens multiple times, and they ignore statements made by ACDC personnel and relayed to Mrs. Stevens. When considered in light of those other allegations, the statistics support many meaningful inferences, all of which favor Mrs. Stevens' claims of an unconstitutional custom.

### iii. County Policy and Procurement

The Governmental Defendants argue that the Amended Complaint contains only the "bald legal conclusion that Sheriff Robertson is a policy-making authority for the County as to the administration of the ACDC" and therefore lacks sufficient allegations to infer that he, as a county policymaker, adopted an unconstitutional policy or custom. MTD at 23. Again, the Governmental Defendants ignore key allegations to the contrary.

"In order to attribute an official's actions to the municipality, a plaintiff must plausibly allege that the official was a policymaker for the purposes of § 1983." *Thornhill v. Aylor*, No. 3:15-CV-00024, 2016 WL 8737358, at *6 (W.D. Va. Feb. 19, 2016). "In other words, the plaintiff must plead facts from which the court can reasonably infer that the official's 'edicts or acts may fairly be said to represent official policy.'" *Id.* (quoting *Monell*, 436 U.S. at 694). "The most critical factor is not 'the

practical finality of an official's acts and edits,' but their policy nature.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986)) (internal edits omitted).

*Thornhill*, *supra*, is instructive, as the facts are similar to those alleged here. In that case, a detainee's medical intake revealed a history of asthma, hypertension, and heroin and alcohol abuse. *Thornhill*, 2016 WL 8737358, at*1. The nurses on duty anticipated that he would go through withdrawal, and indeed, he did. *Id.* at *2-4. But the jail did not have doctors on duty at night and instead relied on an on-call physician for emergencies.[3] The detainee quickly deteriorated, vomiting and defecating on himself, sweating, coughing up blood, becoming disoriented, and falling over. *Id.* at *1-2. Even though he was being monitored by nurses, he ultimately died at the jail, and his estate brought § 1983 claims against the nurses, regional jail authority, and superintendent of the facility for, among other things, the failure to take him to the hospital. *Id.*

In pleading that a custom of deliberate indifference was adopted by policymakers, the complaint "assert[ed] that [the Superintendent] had the 'ultimate power and control over the medical care and attention, if any, provided to the inmates at [the jail]' and that he 'created and facilitated a culture of deliberate indifference to inmates' serious medical needs.'" *Id.* at *7. It then cited "a number of alleged instances of deficient medical care at CVRJ, evidenced by both the events surrounding [the detainee's] death and the alleged mistreatment of other inmates." *Id.* It claimed the

---

[3] This fact came from a later opinion in the same case, in which the Court denied the defendants' motions for summary judgment. *Thornhill for Estate of Berry v. Aylor*, No. 3:15CV00024, 2017 WL 4685986, at *9 (W.D. Va., Oct. 18, 2017).

superintendent "prioritized finances over providing adequate medical care to inmates" and dismissed those who complained about poor treatment at the facility. *Id.* "Moreover, according to the complaint, the [jail] Authority sought to keep operating costs low by denying proper medical treatment to inmates." *Id.*

The jail authority and superintendent moved to dismiss, but the Court found "the complaint plausibly alleges that [the superintendent] was a policymaker at CVRJ[.]" *Id.* While the allegations bordered on conclusory, "at this stage in the litigation, the court can reasonably infer that, as the highest-ranking officer at CVJR, [the superintendent's] acts and edits constituted official policy." *Id.* The Court similarly found that, "based on the Medical Defendants' inadequate treatment of [the detainee]'s serious withdrawal symptoms," the pleading arguably alleged an obvious need for improved training and thus "state[d] a viable claim of deliberate indifference on [the superintendent's] part as the policymaker for CVRJ." *Id.*

Here, the Amended Complaint puts forth at least six facts from which the Court can plausibly find that Cutter and Robertson acted as County officials when they adopted the customs for the medical treatment of inmates – including the alleged custom of keeping inmate hospitalizations down, which led to Mr. Stevens' mistreatment and ultimate death. First, Cutter is at the top of the chain of command at ACDC. Amended Compl. at 5 ¶ 7. Per *Thornhill*, "at this stage in the litigation, the court can reasonably infer that, as the highest-ranking officer at [ACDC], [Cutter's] acts and edits constituted official policy." 2016 WL 8737358, at*7. Second, ACDC regulations state that Cutter "is subordinate to the Sheriff," Amended Compl. at 5 ¶

7, the "managing official" of ACDC who "answers to the citizens of Allegany County." *Id.* at 4 ¶6. Third, in his interview with the press, Cutter held himself out as the County official who negotiated the contract with CCS to provide medical care at ACDC, saying, "I owe it to the taxpayer to negotiate the best deal I can *for the county*." *Id.* at 26 ¶ 113 (emphasis added). Fourth, the Board authorized the 2017 contract with CCS after receiving assurances from Cutter that out of facility transports are rare. Fifth, Cutter said he exercised authority over how County funds for CCS were spent: "*I have to treat that as if it's my own money* – actually I treat that money more tightly than I treat my own money because its taxpayer money." *Id.* at 26 ¶ 113 (emphasis added). Sixth, at least seven individuals of differing degrees of medical skill, *see id.* at 5-7 ¶¶ 9-15, when faced with at least four different episodes in which Mr. Stevens needed emergency treatment, failed to transport him to the hospital. *See id.* at 20-23, 27-29, ¶¶88, 94-100, 102, 117-19, 124-25, 131-32. Like in *Thornhill*, where the Medical Defendants' inadequate treatment of the detainee's serious withdrawal symptoms was enough to support a viable claim of deliberate indifference by the jail's policymaker, the Medical Defendants' repeated mistreatment of Mr. Stevens is adequate to support a claim that Cutter, acting as the policymaker for the county jail and in concert with the Board, who ratified his approach and continued to contract with CCS, had adopted a custom of deliberate indifference.

In turn, the claim that Mrs. Stevens "failed to plead satisfaction of the notice provision" of the Maryland Tort Claims Act (MTCA) is moot. MTD at 21. The Amended Complaint states only that notice was satisfied under the Local

Government Tort Claims Act (LGTCA), not the MTCA, *see* Amended Compl. at 8 ¶ 19, because there are no claims against the State, and the claims against the County arise out of conduct at the *county* jail pursuant to a custom adopted by *county* officials.

Even if the Court still questions whether Robertson and Cutter were acting as county officials at the time of the alleged policymaking, it is not necessary for the Court to make that determination at this stage. *See Durham v. Somerset County,* No. WMN–12–2757, 2013 WL 1755372, at *3 (D. Md. Apr. 23, 2013) *reconsideration denied*, No. JKB–12–2757, 2013 WL 5962958, (D. Md. Nov. 6, 2013) (denying Sheriff's motion to dismiss § 1983 claims on the grounds he was a state, not county actor; because "sheriffs can be either or both, depending on the area in which the policy is being made," discovery was necessary to resolve the issue); *see also Hanlin-Cooney v. Frederick County*, No. WDQ-13-1731, 2014 WL 57673 at *12-*13 (D. Md. Feb. 11, 2014). To survive a motion to dismiss, all Ms. Stevens must do is set forth specific factual allegations from which this Court can conclude that it is plausible that Robertson and Cutter acted as County officials during the relevant time. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. Given the foregoing allegations, she has satisfied those requirements and should be permitted to proceed with her claims against the Governmental Defendants.

The Governmental Defendants argue that even if Robertson and Cutter were deemed to have acted as County officials, the County cannot be liable for that policy or custom, because Robertson and Cutter are considered state personnel. But as the Governmental Defendants also acknowledge, statutory designations are not

dispositive of whether a Sheriff is acting as a state official for purposes of assigning constitutional liability to a municipality. *Dotson v. Chester*, 937 F.2d 920 (4th Cir. 1991) (in holding that Dorchester County was responsible for Sheriff's settlement of §1983 claims over unconstitutional conditions at the county jail, "liability relies more on final policymaking authority than on the technical characterization of an official as a state or county employee"). The Governmental Defendants dedicate substantial analysis to cases in which Sheriffs or Deputy Sheriffs were deemed state officials but give *Dotson* only a cursory mention, summarily concluding that Mrs. Stevens' efforts to reach the County under that case and its progeny fail, because the alleged policy was insufficiently pled. MTD at 22.

By supplanting a *Dotson* analysis with its failure-to-state-a-policy argument, the Governmental Defendants make no attempt distinguish *Dotson* from this case. At this stage in the litigation, that is not enough to defeat the plausible allegation that Robertson and Cutter were acting as County officials in adopting the alleged unconstitutional custom of minimizing hospitalizations at ACDC. That is especially true given the breadth of facts alleged here, the rule that such facts be taken as true, and the rule that reasonable inferences be drawn in favor of the Plaintiff.

The Governmental Defendants also argue that even if the Court allows the *Monell* claim to proceed against the County for Robertson's and Cutters' alleged custom, "the official capacity claims [against Robertson and Cutter] are duplicative of the *Monell* claim against the County and subject to dismissal on that basis." MTD at 27. But the Governmental Defendants fail to appreciate why all three

Governmental Defendants are named as parties. Cutter is charged in his official capacity with using County authority to adopt an unconstitutional custom regarding how medical care would be provided to inmates at ACDC, a *County* jail, by CCS, a *County* contractor, using equipment supplied by the *County*. Robertson, as Cutter's superior and managing official of ACDC, is necessarily charged as the official responsible for that custom. *See Dotson*, 937 F.2d at 922 (the Sheriff was belatedly added as a necessary party to action against jail administrator and County); *Santos v. Frederick County Board of Commissioners*, 346 F.Supp.3d 785, 797-98 (D. Md. 2018) ("Sheriff Jenkins issued the policies under which Deputies Openshaw and Lynch unconstitutional seized and arrested Ms. Orellana Santos. . . .When issuing these policies... Sheriff Jenkins was acting on behalf of Frederick County. . . . Therefore, Sheriff Jenkins is liable in his official capacity as the final policymaker."). Because the County can be financially liable for judgments rendered against Robertson and Cutter over that custom, *see Dotson*, 937 F.2d 920, the County is a necessary party to the lawsuit. *See* Fed. R. Civ. Proc. 19. But the Board is also liable for its condonation of that policy through its repeated procurement of CCS, *see Owens*, 767 F.35 at 102, including at least one decision directly traceable to the fact that out-of-facility transports were few in order to keep costs down, and most care was kept in-house for the same reason. Because the County owns the medical equipment at ACDC and has been advised that 70% of inmates are detoxing from drug or alcohol abuse, it knew the natural and foreseeable consequences of condoning that custom by continuing to procure CCS.

But ultimately, Robertson's, Cutter's, and the Board's actions in adopting or ratifying the alleged custom are inextricably intertwined, as the alleged custom could not persist without each of the other Governmental Defendants' actions. *See Farris v. Moeckel*, 664 F.Supp. 881, 891 (D. Del. 1987) ("*both* the McKinley County Sheriff's Department *and* the Board of Commissioners are endowed with policy-making authority. … As such, I believe the relationship between the County and the Sheriff's Department to be so close as to render the County liable for any unconstitutional policies, practices, or customs instituted by the Sheriff" and "Farris correctly named the Board of Commissioners as defendants in this action" (emphasis added)). That is precisely why Cutter and Robertson, in adopting the custom of minimizing hospitalizations, are alleged to have acted as County policymakers. That is also precisely why all three Governmental Defendants are parties to the action.

The Governmental Defendants argue that official capacity claims against Robertson and Cutter are barred by the Eleventh Amendment. MTD at 26. But the Eleventh Amendment does not automatically bar liability in this context. *See Ram Ditta By & Through Ram Ditta v. Maryland Nat. Capital Park & Planning Comm'n*, 822 F.2d 456 (4th Cir. 1987) (test for whether Eleventh Amendment immunity will apply). And when a Sheriff undertakes conduct in a municipal capacity, and the County is financially liable, Eleventh Amendment immunity may not apply. *See Santos*, 346 F.Supp. at 799-800.

### iv. Written Policies

The Governmental Defendants try to attack allegations that support finding an unconstitutional custom at ACDC by pointing to written policies that contradict the allegations. Specifically, they rely on a local ordinance that requires the Sheriff to fund hospitalizations, and ACDC regulations that prohibit interference with or restriction of medical care. MTD at 7-9. But it is not uncommon for an institutional policy or custom to be unwritten, *Pembaur*, 475 U.S. at 480-81, 106 S.Ct. 1292 ("To be sure, 'official policy' often refers to formal rules or understandings – often *but not always committed to writing* – that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." (emphasis added)), and municipalities can still be liable for such informal practices. *See Randall v. Prince George's County, Md.*, 302 F.3d. 188, 210 (4th Cir. 2002) (where Plaintiffs contended that "County maintained an *unofficial* policy of detaining persons against their will" without probable cause, recognizing there may be municipal liability for "an unconstitutional 'custom or usage' i.e. widespread practice of a particular unconstitutional method" (emphasis added)); *Ward v. City of Hobbs*, 398 F.Supp.3d 991, 1039 (D. N.M. 2019) *appeal filed*, No. 19-2137 (10th Cir., Aug. 30, 2019) ("With informal, *unwritten* policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct" (emphasis added)); *Hunter v. City of New York*, 35 F.Supp.3d 310, 323, 325 (E.D.N.Y. 2014) (where Plaintiff claimed prison officials "pursue[d] the '*unspoken* and widely accepted policy' of denying much needed medical attention" to inmates, "allegations [were] sufficient,

perhaps just barely, to plausibly state a claim of municipal liability" (emphasis added)). This is especially true when the alleged unwritten or unspoken custom is one of a questionable or illegal nature. For example, governmental units often adopt written policies assuring that they conform to anti-discrimination mandates, but discrimination undoubtedly still occurs, sometimes on a widespread level. That an alleged unwritten, unconstitutional custom is inconsistent with writings, regulations, or rote recitations of rules does not change the plausible inference that it exists.

v.  **Subjective Knowledge**

The Governmental Defendants claim "there are no allegations in the Amended Complaint from which the Court may infer that either Sheriff Robertson or Captain Cutter had subjective knowledge of any serious medical condition endured by Mr. Stevens, which they then disregarded." MTD at 18. Again, the Governmental Defendants misread the Amended Complaint and apply the wrong standard.

"In order for liability to attach [under *Monell*], (1) the municipality must have 'actual or constructive knowledge' of the custom and usage by its responsible policymakers, and (2) there must be a failure by those policymakers, 'as a matter of specific intent or deliberate indifference,' to correct or terminate the improper custom and usage." *Randall*, 302 F.3d. at 210 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)). It is this second portion of the test – Robertson's and Cutter's deliberate indifference, and the requisite knowledge for establishing *that* – that the Governmental Defendants suggest has not been satisfied.

"Deliberate indifference has both an objective and a subjective component."
*Thornhill for Estate of Berry v. Aylor*, No. 3:15CV00024, 2017 WL 4685986, at *9
(W.D. Va., Oct. 18, 2017). "As to the subjective component, an official must have been
'aware of facts from which the inference could be drawn that a substantial risk of
serious harm exist[ed]' and the official must have also drawn the inference." *Id.* at
*10 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

However, "a factfinder may infer that an official subjectively appreciated a
serious risk to an inmate based on 'circumstantial evidence' that the official knew the
risk of harm or by the obviousness of the risk itself[.]" *Id.* (citing *Farmer*, 511 U.S. at
842). Moreover, the official contemplated in the foregoing quote is the individual who
is *personally* accused of depriving a particular prisoner of medical care. In the *Monell*
context, the municipal policymaker need only have knowledge of the *custom or policy*
of deliberate indifference to associated risks for harm, not the *specific injury* at issue.
*See Shields v. Prince George's County*, No. GJH-15-1736, 2016 WL 4581327 at *9 (D.
Md., Sept. 1, 2016) ("Defendant, Corizon, correctly notes that *none of these allegations
relate to the facility or even the state at issue in this case* . . . .But Corizon is 'a company
that provides healthcare services to state and county correctional facilities and jails
nationwide.' ECF No. 52-1 at ¶ 26. Thus, its activities in a variety of states can be,
and in this case are, relevant to the issue of custom and policy here. Therefore,
Plaintiff has sufficiently alleged that Corizon has a pattern, practice, policy and
custom of denying inmates access to appropriate, competent and necessary care...")

And consistent with the permissive use of circumstantial evidence to infer knowledge at the pleading stage, knowledge of a municipal policy and indifference to its harms "can be inferred from the 'extent' of employees' misconduct." *Owens*, 676 F.3d at 403 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1391 (4th Cir. 1987)); *see Slakan v. Porter*, 737 F.2d 368, 375 (4th Cir. 1984) (in case of supervisory liability, "it is inconceivable that an administrator with direct statutory responsibility for prescribing the operating rules of the prison system would be unaware of a practice as rampant and as widely approved of as the use of water hoses against securely confined inmates.").

Here, the Amended Complaint alleged facts that support the plausible inference that Robertson, Cutter, and the County had knowledge of the custom of keeping hospitalizations to a minimum and thus acted with deliberate indifference in adopting or condoning it. Those facts, already listed *infra*, include but are not limited to: (1) Cutter told the Board that there are very few transports out of the facility, resulting in fewer hospital bills, Amended Compl. at 26 ¶ 113; (2) statistics show hospitalizations are rare at that facility, *id.* at 27 ¶ 115-16; (3) a website for ACDC advises: "All out of facility appointments . . . have to be approved by CCS before we can send the inmate out," *id.* at 25 ¶ 109, yet there is no ACDC Regulation requiring or guaranteeing that a physician will be present at the facility, *id.* at 16 ¶ 60; (4) while advising the Board that hospital trips are rare, Cutter said "that approximately 70% of the individuals who come into the facility are detoxing," *id.* at 39 ¶ 185; (5) Cutter told the Cumberland Times-News that he treats County money

"more tightly than I treat my own money…" and his philosophy on sick inmates leaked during that conversation; *id.* at 26 ¶ 113; and (6) one of the nurses charged with Mr. Stevens' care and at least one correctional officer made comments during Mr. Stevens' detention indicating that they knew he was fatally ill and wanted him released as soon as possible, so he would not die inside the facility. *Id.* at 34 ¶ 164. While it cannot yet be established whether Cutter definitively knew each and every fact in the Amended Complaint, he is at the top of the chain of command at ACDC. *Id.* at 5 ¶ 7. Accordingly, it is reasonable to infer that he at least knew CCS had adopted his philosophy of keeping medical care in house as much as possible in order to reduce costs.

As for the risks that custom posed to inmates, the risk of repeated resistance to hospitalizations, particularly when so many inmates experience a high-risk medical condition during their detention, is a natural and obvious consequence of that custom. Again, it is compelling that *multiple* individuals failed to transport Mr. Stevens to the hospital during *multiple* episodes of life-threatening distress.

### vi.    Medical Judgment

The Governmental Defendants argue that even if "Sheriff Robertson and Captain Cutter were aware of Mr. Stevens' up and down conditions," which they need not be, as described above, they "were entitled to rely on the judgment of the Medical Co-Defendants..." MTD at 17, 20. They correctly note the obligation to defer to qualified health care providers on matters of medical judgment. *See Moses v. Stewart*, No. TDC-15-38752017 WL 4326008, at *5 (D. Md. Sept. 26, 2017) ("prison non-

medical staff are 'entitled to rely' on the competence and expertise of prison health care providers." (quoting *Miltier v. Boern*, 896 F.2d 848, 854-55 (4th Cir. 1990)).

But even after procuring medical personnel for a detention center, the facility's administrator still has the responsibility of overseeing daily operations, ensuring there is adequate staffing, and monitoring the conduct of providers in the detention center. *Estelle v. Gamble*, 429 U.S. 97, 116 n.13 (1976) (there is a constitutional duty to provide inmates "reasonable access to medical care, to provide competent, diligent medical personnel, and to ensure that prescribed care *is in fact delivered*." (emphasis added)); *see also James v. Ozmint,* No. 1:09-1351-HMH-SVH, 2010 WL 3169609, at *6 (D.S.C. July 13, 2010) ("Prison personnel may rely on the opinion of the medical staff *as to the proper course of treatment*." (emphasis added) (citations omitted)). And here, the Governmental Defendants do not address Plaintiff's allegation that no doctors were present at ACDC during Mr. Stevens' stay. (*see e.g.* Amended Compl. 38, ¶182). There is no proof that Defendants Manger and Piazza were there, given that Dr. Manger's orders were all verbal and recorded by Logsdon or Shroyer, and Logsdon's note about Piazza indicates that she called him. Considered against the backdrop of Cutter's remarks, this fact is consistent with the alleged custom. But importantly, the decision to have doctors off-site is not a matter of medical judgment but a question of staffing and budgetary priorities. Likewise, repeated contracting with CCS, based on a decision to keep care-in house and hospitalizations low, is a matter of procurement, not medical judgment.

The Governmental Defendants cite to *Miltier*, *supra*, 896 F.2d 848, and *Gardner v. United States*, 184 F. Supp.3d 175 (D. Md. 2016), for the proposition that deference to medical providers can defeat *Monell* claims in the context of supervisory liability.[4] But *Miltier* was at the summary judgment stage, and *Gardner* is about claims against an individual officer who personally ordered the decedent to be assigned to work outside. Thus, neither are applicable to the issues raised here.

In conclusion, despite the Governmental Defendants' efforts to attack the Amended Complaint, the factual allegations are sufficient to support an unconstitutional custom under *Monell* and *Longtin*. Accordingly, Counts 2 and 4 should survive.

**B. The Amended Complaint Contains Detailed Descriptions of Multiple Instances of Mistreatment And An Expert Report Explaining That The Medical Defendants' Failure to Hospitalize Mr. Stevens Caused His Death, Thus Plaintiff Has Sufficiently Pled A Causal Link Between The Alleged Custom and Mr. Stevens' Death.**

The Governmental Defendants argue that Mrs. Stevens failed to establish a causal link between the alleged unconstitutional policy and Mr. Stevens' death, because there was no indication that the Medical Defendants modified their treatment of Mr. Stevens, and the Amended Complaint relies on "rank speculation" in place of those allegations. The Governmental Defendants are wrong.

To establish municipal liability for an unconstitutional policy or custom, the "Plaintiff must also allege that the policy or custom proximately caused the instant

---

[4] The *Monell* claims alleged in this case were not plead in the posture of supervisory liability but rather were akin to a custom of deliberate indifference and condonation. *See*, *e.g. Owens*, 767 F.3d at 402-03.

constitutional injury." *Thornhill*, 2017 WL4685986, at *14 (quoting *Newbrough v. Piedmont Reg'l Jail Auth.*, 822 F. Supp. 2d 558, 584 (E.D. Va. 2011)). "This relationship may be satisfied by evidence of 'a logical and natural connection between a policy or custom of deficient medical care and an instance of inadequate medical care.'" *Id.* (quoting *Newbrough*, 822 F. Supp. 2d at 585).

Here, to show a causal link between the policy and injury, Mrs. Stevens must address two questions related to causation. The first is whether the Medical Defendants' repeated failure to hospitalize Mr. Stevens was the proximate cause of his death. The second is whether those failures were a logical and natural consequence of the alleged custom of minimizing the hospitalization of inmates at ACDC in order to keep costs down. The Amended Complaint contains sufficient and detailed factual allegations to plausibly answer both questions in the affirmative.

As to the first question, a Certificate of Qualified Expert and Expert Report were submitted as an Exhibit to the Amended Complaint. *See* ECF 6-1.[5] In that report, Dr. Steven Tropello, a physician who is Board-Certified in Emergency Medicine, opined that the Medical Defendants' repeated failure to hospitalize Mr. Stevens caused his death.  Rept. of Steven P. Tropello (ECF 6-1) at 18 ("In short, if at any time during Mr. Stevens' detention the medical professionals named in this report had ordered any diagnostic testing or took Mr. Stevens to the hospital, he would have lived."). The Governmental Defendants completely ignore this document.

---

[5] In Maryland, obtaining a Certificate of Qualified Expert is a condition precedent to bringing action against a medical provider. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-2A-06B(b)(1).

As to the second question, the Amended Complaint alleges that *multiple* care providers of differing skills and backgrounds, when presented with *multiple* episodes in which Mr. Stevens was patently in distress and in need of emergency medical treatment, all opted not to take him to the hospital. These episodes alone are enough to plausibly infer a causal link between the alleged custom and Mr. Stevens' death.

The Governmental Defendants suggest that those allegations are not enough to show that the Medical Defendants' course of treatment was impacted or modified by the alleged custom. To be sure, the medical records do not show the entire thought process of each Medical Defendant. It is unclear if they considered hospitalization and decided against it expressly because of the custom or if they subconsciously resisted the idea because they had internalized an unconstitutional practice. Nevertheless, the near-uniform breaches of the standard of care by the Medical Defendants, statements made by Cutter, statements relayed to Mrs. Stevens, and CCS statistics, all support the inference that there was a conscious and collective decision not to hospitalize Mr. Stevens. Thus, the Court can reasonably infer that the Medical Defendants did, in fact, modify their treatment of Mr. Stevens, by – consistent with the unconstitutional custom advocated by Cutter and ratified by the County – refusing to take him to the hospital and instead opting to "ride out" his time at ACDC with Librium, Gatorade, Lisinopril, and basic monitoring.

The Governmental Defendants take issue with the fact that the Amended Complaint contains the phrase "information and belief" at least 25 times, arguing that allegations of a causal link are based on nothing more than "rank speculation."

First, such text is permissible in a pleading. *See Owens*, *supra,* 767 F.3d at 403 ("The recitation of facts need not be particularly detailed"). Second, this pleading could hardly be called "rank speculation" given its breadth of detail. The Amended Complaint is 45 pages long and provides numerous nuanced descriptions of Mr. Stevens' condition and treatment gleaned from medical and detention records. It goes well beyond what is normally required or done in a pleading of this kind. In short, the Governmental Defendants' misrepresentation about the Amended Complaint is not enough to warrant dismissal under Rule 12(b)(6).

## II.  COUNT 3 (*RESPONDEAT SUPERIOR*)

The Governmental Defendants argue that the County is not liable for the Medical Defendants' violations of Mr. Stevens' protections under the Maryland Declaration of Rights, because there is no evidence of an agency relationship between those Defendants and the County. Specifically, the Governmental Defendants point to the County's contract with CCS, which says the medical providers are neither agents nor employees of the County. The Governmental Defendants' interpretation of the allegations is incorrect.

The Maryland Court of Appeals has held, "as a matter of common law, that local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment." *DiPino v. Davis*, 354 Md. 18, 51-52, 729 A.2d 354, 372 (1999). Three characteristics are key to an agency relationship: (1) the agent's power to affect the principal's legal relationships with third parties;

(2) the agent's duty to act for the benefit of the principal; and (3) the principal's control over the agent. *Green v. H & R Block, Inc.*, 355 Md. 488, 503, 735 A.2d. 1039, 1048 (1999).

An agency relationship can be formed when the agent acts with the apparent authority of the principal when dealing with third parties. "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons." *American Soc. of Mechanical Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 566 n. 5, 102 S.Ct. 1935, 1942 n. 5, 72 L.Ed.2d 330 (1982) (citation omitted). The Court of Appeals further explains:

> As is evident, the doctrine of apparent agency has both subjective and objective elements: a plaintiff must show that the plaintiff subjectively believed that an employment or agency relationship existed between the apparent principal and the apparent agent, and that the plaintiff relied on that belief in seeking medical care from the apparent agent. But the plaintiff must also show that the apparent principal created or contributed to the appearance of the agency relationship and that the plaintiff's subjective belief was "justifiable" or "reasonable" under the circumstances—an objective test.

*Bradford v. Jai Medical Systems Managed Care Organizations, Inc.*, 439 Md. 2, 18-19, 93 A.3d 697, 707 (2014).

Accordingly, Counties can be vicariously liable for State constitutional violations committed by agents acting with apparent authority. *Prince George's County, Md. v. Morales*, No. 1308 Sept. Term, 2014, 2016 WL 4723437, at *18 (Md. Ct. Spec. Apps. Sept. 8, 2016) (where county was liable for off-duty police officer's altercation with plaintiff at frat party, at which officer was working an extra-job in

violation of department policy, "[t]he jury benefitted from hearing [instructions on actual and apparent agency], in determining whether Richardson was acting within the scope of his employment, it could consider Richardson's apparent authority to act as a police officer notwithstanding the undisclosed restriction on his extra-duty work based on his light duty status.).

*Debbas v. Nelson*, while not a case about municipal liability, is also instructive about how apparent authority applies in the context of medical care. 389 Md. 364, 885 A.2d 802 (2005). The relevant facts and law can be gleaned from this excerpt:

> In its motion for summary judgment, the Hospital also asserts that Respondents lacked sufficient evidence to create a question of material fact regarding the agency relationship between the defendant physicians and the Hospital. *The Hospital contends that the physicians were independent contractors and that no agency relationship exists.* The Circuit Court, in orally granting the Hospital's motion for summary judgment, stated that there was "insufficient evidence to support a continuation of the case on the basis of apparent authority." We disagree.
>
> In the context of medical malpractice litigation, we have endorsed the apparent authority theory of agency as stated in the Restatement (Second) of Agency Section 267, which provides in pertinent part:
>
>> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care or skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care or skill of the one appearing to be a servant or other agent as if he were such.

*Id.* at 384-85, 885 A.2d 815-14 (emphasis added) (citing *Mehlman v. Powell*, 281 Md. 269, 273, 378 A.2d 1121, 1123 (1977)).

In this case, the Medical Defendants were acting with the apparent authority of the County when they violated Mr. Stevens' rights under the Maryland Constitution. First, the Medical Defendants' made the following manifestations: they

decided Mr. Stevens could not bring in his oxygen tank. They decided he could not bring in his syringe needles. They controlled his ability to get to a hospital. They ordered what kind of food he would eat and where he would sleep. In short, they were *the* medical unit of the *County* jail.

Second, the principal – the County – contributed to this appearance. It contracted with the same company to provide medical personnel at ACDC for over a decade. And through that procurement, it assisted Cutter's plan of keeping most care in-house, thereby distinguishing medical care provided at ACDC via CCS from the care an inmate would receive from an out-of-facility transport. And the County funded the equipment that CCS used. Like in *Debbas*, where the hospital's contention that physicians were independent contractors did not undermine evidence of an agency relationship, the terms of the contract between CCS and the Board have no bearing on the interactions between the Medical Defendants and detainees at ACDC.

Third, the Medical Defendants had the ability to affect the legal relationship between the County and Mr. Stevens, as the County used CCS as a tool for carrying out their duties to Mr. Stevens. The Medical Defendants were responsible for providing medical care to inmates for and to the benefit of the Sheriff, who is constitutionally responsible for providing medical care to inmates, *and* to the benefit of the County, who is responsible for funding that care.

As for Mr. Stevens' state of mind and reliance, there is simply no reason Mr. Stevens or any other reasonable person in his position would distinguish the medical

unit at ACDC from other county personnel staffing the facility. Some of his interactions with the Medical Defendants stemmed not from his medical needs but the booking process; for example, he was subjected to a mandatory medical intake. Moreover, Mr. Stevens was completely at the mercy of the Medical Defendants, just as he was at the mercy of the correctional officers. He had no choice but to rely on their medical judgments, and the ability to go to the ER was entirely out of his hands. When he was sick, the medical unit was his only option. On at least one occasion, he went to the medical unit. On other occasions, the medical unit came to him.

Accordingly, under principles of apparent authority, the Amended Complaint sufficiently alleges factual allegations from which an agency relationship between the County and the Medical Defendants can be inferred. In turn, that means the County could be vicariously liable for their State constitutional torts. *DiPino*, 354 Md. at 51-52, 729 A.2d at 372.

The Governmental Defendants argue that the elements of an agency relationship flow to Wellpath, instead of the County. MTD at 28. They specifically argue that "there are no facts alleged which describe control [of the Medical Defendants] by the County," and point to regulations and rules that prohibit interference in the Medical Defendants' decisions about the treatment of inmates and detainees. *Id.* But again, the alleged custom of limiting hospitalizations to keep costs down is alleged as an unspoken, unwritten practice. As for whether it did in fact limit the Medical Defendants' decisions, without repeating the causal link allegations, *supra*, the repeated failures to hospitalize Mr. Stevens speak for themselves.

Because the Amended Complaint sufficiently alleges an agency relationship between the County and Medical Defendants, Count 3 should survive.

## CONCLUSION

For the foregoing reasons, Mrs. Stevens respectfully asks the Court to deny the Governmental Defendants' Motion to Dismiss. Under general pleading standards, as well as the standard for pleading causes of action pursuant to § 1983, the Amended Complaint contains sufficient factual allegations to state plausible claims under *Monell* and *Longtin*, as well as a vicarious liability claim against the County for the Medical Defendants' violations of Mr. Stevens' rights under the State constitution.

Date: February 5, 2020

Respectfully submitted,

_____/s/_____
Lauren McLarney (Fed Bar #20982)
Charles N. Curlett, Jr. (Fed Bar #28246)
Rosenberg Martin Greenberg, LLP
25 S. Charles St. 21st Floor
Baltimore MD 21202
Phone: (410) 727-6600
lmclarney@rosenbergmartin.com
ccurlett@rosenbergmartin.com

*Counsel for Plaintiff Shelly Stevens*