THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

SHELLY STEVENS, *et al*  *

    Plaintiffs,  *

v.  *     Civil Case No. 19-cv-03368-JMC

BOARD OF COUNTY COMMISSIONERS
FOR ALLEGANY COUNTY,
MARYLAND, *et al*  *

    Defendants  *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **MEMORANDUM**

This suit arises out James Leslie Stevens' ("Mr. Stevens" or "Decedent") unfortunate death, which occurred less than twenty hours after his release from the Allegany County Detention Center ("ACDC" or the "Detention Center"). (ECF No. 6 ¶ 159–60). Suit is brought by his estate and his surviving spouse ("Plaintiffs"). The parties consented to proceed before a Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF No. 60). On November 26, 2019, Plaintiffs filed an Amended Complaint. (ECF No. 6). Now pending before the Court is a Motion to Dismiss (ECF No. 55) filed by the Board of County Commissioners for Allegany County, Maryland, Sheriff Craig Robertson and Captain R. Lee Cutter (collectively the "Government Defendants").[1] Plaintiffs filed an Opposition, and the Government Defendants filed a Reply. (ECF Nos. 65 & 68). The issues have been briefed, and the court now rules, no hearing being deemed necessary. *See* Local R. 105.6. For the reasons outlined below, the Government Defendants' Motion to Dismiss will be GRANTED.

---

[1] Defendant Well Path, LLC, known as Correct Care Solutions ("CCS") at the time of these events, is a limited liability company contracted to provide medical care services to inmates at the Allegany County Detention Center. (ECF No. 6 ¶ 8). Neither CCS nor any of the medical provider defendants (collectively the "Medical Defendants) join in this Motion.

1

I. BACKGROUND

The relevant factual allegations contained in Plaintiffs' First Amended Complaint are summarized as follows.[2] Mr. Stevens surrendered to the Detention Center on the night of November 24, 2016 pursuant to the bench warrant issued for his arrest by the Allegany County Circuit Court on November 17, 2016. (ECF No. 6 ¶¶ 1, 21). At the time of his surrender, Mr. Stevens was forty-four years old, and suffered from many serious medical disabilities. *Id.* ¶ 25. Of note, Mr. Stevens "weighed approximately 375 pounds and had a history of congestive heart failure, chronic systolic hypertension (high blood pressure), asthma, sleep apnea, low testosterone, neuropathy, and diabetes mellitus." *Id.* He was also insulin and oxygen dependent and wore compression stockings. *Id.* He was prescribed, and taking, a host of medications to treat or manage his health conditions. *Id.* The incoming inmate medication record denotes Mr. Stevens had twenty medications with him, as well as a portable oxygen tank, an aerosol delivery system, a Respironics chamber, insulin needles, TED socks, and two Velcro compression stockings. *Id.* ¶ 32. In "addition to prescription medications, [Decedent] smoked cigarettes and drank alcohol, and had a history of recreational drug use." *Id.* ¶ 26.

Within fourteen minutes of intake, Dawn Michelle Holler, a Licensed Practical Nurse employed by CCS and working at ACDC, completed a primary medical screening of Decedent. *Id.* ¶¶ 9, 31. According to Detention Center regulations, the purpose of this reception screening is to "identify immediate medical problems/conditions" and assist in the "prevention of complications such as death, epidemic, suicides, and assaults." *Id.* ¶ 31. The patient questionnaire

---

[2] The factual allegations, as taken from Plaintiffs' Amended Complaint, are accepted as true for the purposes of the pending motion. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint.").

completed indicates Decedent was being treated for asthma, diabetes, a heart condition, high blood pressure, and that he had been hospitalized and, on a ventilator, a "couple weeks ago." *Id.* ¶ 32. LPN Holler reviewed Decedent's drug history and noted that he reported that he drank alcohol, was a heavy smoker, used oxycodone and heroin regularly (as well as benzodiazepines when opiates were unavailable), and had last used drugs earlier that day (November 24, 2016). *Id.* ¶ 34. Decedent indicated that he had a history of drug withdrawal, but the only symptom he experienced was "loose stools." *Id.* ¶ 35. LPN Holler's notes from this reception screening indicate Decedent's extensive health issues, a large quantity of medications, ted and Velcro compression wraps, and that Decedent would be re-evaluated by a physician in the morning, to include, a review of his insulin and other medication orders. *Id.* ¶ 47. In addition, Decedent was informed of how to access medical services and completed a "release of information request" to be sent to the hospitals, doctors, and pharmacies where Decedent had previously been treated. *Id.* By 8:52 a.m., the Western Maryland Health System transmitted Decedent's medical records to the Detention Center. *Id.* ¶ 61.

Despite his "co-morbid medical conditions" and a recent injury to his leg, the "primary medical screening records confirm that [Decedent] was in stable condition at the start of his detention." *Id.* ¶¶ 28, 39. The medical status checklist indicates that Decedent was alert and orientated, thinking logically, and acting and speaking appropriately. *Id.* ¶ 36. While "stable" Decedent indicated that he was in pain, providing a rating of six out of ten on the pain scale, and his blood pressure was extremely high, at 185/100. *Id.* ¶¶ 33–39. LPN Holler issued three medical orders for Decedent. These orders included: (1) Alcohol and Benzodiazepine withdrawal treatment; (2) an opiate withdrawal protocol; and (3) a 2,800-calorie diabetic diet. *Id.* ¶ 42–45.

LPN Holler began the two withdrawal protocols within a few hours of Decedent's admission, around 1:55 A.M. *Id.* ¶ 48–49. At 6:55 a.m., LPN Holler issued an order addressing the management of Decedent's diabetes, including prescribing how and when his blood sugar would be tested and how much insulin would be dispensed. *Id.* ¶ 54. "Over the next few hours, Defendants Shroyer[3], Manger,[4] and Logsdon[5] reviewed Defendant Holler's initial orders and evaluated Mr. Steven's medical needs. Physician's Orders were given, and medication was prescribed." *Id.* ¶ 52. Nurse Shroyer approved LPN Holler's preliminary screening of Mr. Stevens, and Nurse Logsdon made a "Master Problem List" for Mr. Stevens, noting IDDM (insulin dependent diabetes mellitus), HTN (hypertension), cardiac, asthma, obesity, drug and alcohol abuse. *Id.* ¶ 553–54. At 8:00 a.m., Dr. Manger approved the diabetes protocol issued by LPN Holler and gave a verbal order that Decedent was to continue taking the physician-approved medication that he brought to the Detention Center from his own supply and at the prescribed dosages. *Id.* ¶ 55. At this time, Dr. Manger also prescribed Decedent five new medications, pursuant to the two withdraw protocols, including Vitamin B and Librium. *Id.* ¶ 56.

Decedent received his first dose of Librium at 8:00 a.m. on November 25, 2016. *Id.* ¶ 57. At 1:45 p.m., within twelve hours of Decedent's detention, Nurse Shroyer spoke with Decedent's daughter via telephone, and requested she inform Decedent's wife to come back and pick up items that were not approved for use, specifically his O2 tank, syringes, inhaler chamber, and his aerosol

---

[3] Defendant Stephanie Diane Shroyer is a Registered Nurse. (ECF No. 6 ¶ 10). She was employed by CCS and worked at ACDC at the time of the events giving rise to this action. *Id.*

[4] Donald Frederick Manger is a Medical Doctor and maintains a family and pediatric practice in Cumberland, Maryland. *Id.* ¶ 11. At the time of the events giving rise to this action, Dr. Manger was an independent contractor with ACDC. *Id.*

[5] Leslie Anne Logsdon is a Registered Nurse. At the time of the events giving rise to this action, she was employed by CCS and worked at ACDC. *Id.* ¶ 12.

delivery system. *Id.* ¶ 65. Nurse Shroyer's progress notes indicate that the "meds [and] chart were reviewed by Dr. Manger this morning, and no O2 was necessary at this time, as his saturation levels in the [upper] 90's." *Id.* ¶ 67.

At 4:00 p.m. Nurse Logsdon provided Decedent with a second dose of Librium. *Id.* ¶ 68. At 4:15 p.m., Decedent's blood pressure increased to 190/112, he started vomiting, and his so-called Clinical Opiate Withdraw Score ("COWS") reflected a "3" next to "GI upset." *Id.* ¶ 72. Fifteen minutes later, Decedent's "alcohol withdrawal assessment score" jumped from one to seven due to his excessive vomiting, and then five minutes later his blood sugar was measured at 205. *Id.* ¶¶ 73–74. At 8:55 p.m., Nurse Logsdon took Decedent's vital signs, indicating his respiration rate had increased from twenty to twenty-four. *Id.* ¶ 78. In response, Nurse Logsdon gave Decedent twenty ounces of Gatorade, and checked his oxygen saturation level which was at ninety-four percent. *Id.* ¶ 89. Nurse Logsdon left the Detention Center around 9:00 p.m., and it is "unclear who, if anyone, monitored Mr. Stevens' health during the next few hours." *Id.* ¶ 90.

When Nurse Logsdon returned to the Detention Center around 1:00 a.m., she found Decedent in a cot within the booking department. *Id.* ¶ 92. At this time, she observed beads of sweat on Decedent's face and forehead; noticed his chest was damp; the correctional officers also Nurse Logsdon that he had been vomiting occasionally; and he was restless and disoriented. *Id*. When Nurse Logsdon took Decedent's vital signs, his pulse had dropped twelve points, while his "respiration rate increased to an alarmingly high rate." *Id.* ¶ 93.[6] Decedent's oxygen saturation levels fluctuated between ninety-four and ninety-five percent, and his alcohol withdrawal and COWS scores were nineteen and thirteen, respectively, because he was vomiting, sweating, and experiencing auditory disturbances, anxiety and aches. At this time, Nurse Logsdon contacted

---

[6] Plaintiffs do not include what this respiration rate was.

Physician's Assistant Piazza, and advised him of Decedent's status.[7] *Id*. ¶ 100. PA Piazza ordered an increase in Decedent's dosage of Lisinopril, from twenty to forty milligrams, which he was taking to prevent a heart attack. *Id*. ¶ 103. Around 1:05 a.m., Decedent was given a dose of Lisinopril, ten ounces of Gatorade, a cool cloth for his forehead, and extra blankets to prop up his head. *Id*. ¶ 103–04. Nurse Logsdon offered Decedent additional medications, but he refused. *Id*. ¶ 105. Nurse Logsdon urged Decedent to reconsider and also offered him "his O2," but he rejected that, as well. *Id.*

At 6:00 a.m. on Saturday, November 26, Nurse Logsdon assessed Decedent again. *Id*. ¶ 118. The extent of his vomiting, sweating, agitation, disturbances, anxiety, and aches had not reduced since the early morning. *Id*. At 8:00 a.m., Licensed Practical Nurse Shutts[8] administered Librium. *Id*. ¶ 120. At 8:55 a.m., Decedent was re-assessed, his resting pulse rate had increased by ten points and his respirations were "still" very high at twenty-five. Although Decedent's alcohol withdrawal assessment and COWS scores "had gone down, he continued to exhibit the aforementioned symptoms like vomiting and sweating." *Id*. ¶ 121.

By late afternoon, LPN Shutts noted Decedent had stabilized. *Id*. ¶ 122. His oxygen saturation level was ninety-five percent; he was taking his medications without dysphasia; the vomiting had stopped; and he was no longer disoriented. *Id*. At 5:00 p.m., when LPN Shutts re-assessed Decedent, his respiration rate remained at twenty-five, his pulse rate had increased to 100, and his blood pressure was stable. *Id*. ¶ 124. He still exhibited symptoms of nausea, sweating and anxiety. *Id*. When re-assessed at 8:54 p.m., Decedent's vital signs and withdrawal scores remained

---

[7] Defendant James Anthony Piazza is a Physician's Assistant. (ECF No. 6 ¶ 13). At the time of the events giving rise to this action, PA Piazza was affiliated with ConMed Health Care Management, an independent contractor of the Allegany County Detention Center. *Id.*

[8] Defendant Lisa Shutts is a Licensed Practical Nurse and was employed by CCS and worked at ACDC, at the time of the events giving rise to this action. *Id.* ¶ 14.

relatively unchanged, but his respiration rate jumped to twenty-eight. *Id*. ¶ 126. Sometime after this, but before the next morning, Nurse Shroyer determined Decedent would no longer be monitored for opiate withdrawal. *Id.* ¶ 128.

The next morning, November 27, 2016, at 9:10 a.m., Decedent was vomiting, sweating, and agitated to a lesser degree than the morning before. *Id*. ¶ 129. However, his alcohol withdrawal score increased by one point; his systolic blood pressure increased from 133 to 179; his pulse rate had increased 99 to 107; and his respiration rate remained at twenty-six. *Id*. Decedent was monitored throughout the day and given medication and insulin. *Id*. ¶ 130. At 8:58 p.m., LPN Shutts found Decedent lying in his bottom bunk soaked in his own urine. *Id.* ¶ 131. In accordance with Decedent's request, LPN Shutts provided him with Tums and Gatorade and helped him into a new set of clothes. *Id*. ¶ 133. At this time, Decedent's blood pressure and pulse rate had dropped, he could ambulate, he was more anxious and disoriented than a few hours before, and accordingly, his alcohol withdrawal score increased by another two points. *Id*. ¶ 131.

Over the next twelve hours, Decedent appeared to stabilize. He was observed throughout the night and did not demonstrate distressed breathing, nor was he vomiting. *Id*. ¶ 135. However, at 6:30 a.m., on Monday November 28, 2016, Decedent refused a meal and chose to remain in his bunk, and by 9:12 a.m., his temperature was up to 99.8 degrees. *Id*. ¶ 136. At 2:30 p.m., Nurse Shroyer reported that Decedent smelled strongly of urine and body odor and advised correctional staff that he needed a shower. *Id*. ¶ 138. Within twenty minutes, Decedent was showered, with assistance of a correctional officer, who reported that Decedent was short of breath during the shower. *Id*. ¶ 139. At 3:50 p.m., Defendant Brashear, a licensed practical nurse for CCS, was called to the Booking Department to address Decedent's shortness of breath during his shower. *Id*. ¶ 143.

On the evening of November 28, 2016, Decedent was transported from the detention center to his bail hearing. *Id*. ¶ 144. "On information and belief, [Decedent] was visibly listless and confused throughout the hearing." *Id*. ¶ 145. By 7:11 p.m., Decedent posted a $5,000 bond, and the Court ordered his release. *Id*. ¶ 146. LPN Brashear noted that Decedent was stable upon his release from the detention center. *Id*. ¶ 150. She advised Decedent to follow up with his primary care providers or local emergency room "for any issue." *Id*. ¶ 151. Decedent was noticeably listless and unwell, but signed a Continuity of Care form, in a distinctly sloppier print than on his reception screening records. *Id*. ¶ 153.

At 8:00 p.m., on November 28, 2016, Decedent was released from the Detention Center, and escorted out to his wife's car in a wheelchair. *Id*. ¶ 154. Decedent's wife realized he was unwell and made an appointment for him at his primary care provider for November 30, 2016, which was the earliest appointment available. *Id*. ¶ 155. The next morning, November 29, 2016, Decedent woke up in his home feeling unwell and disoriented. He requested his wife prepare him food to absorb "whatever they gave me." *Id*. ¶ 157. Although worried about her husband, Mrs. Stevens left him alone in their home, when she went attend a meeting that she was legally obligated to attend. *Id*. ¶ 159. When Mrs. Stevens returned at 5:11 p.m., Decedent was dead. *Id*. ¶ 160. A partial autopsy was performed, and the cause of Decedent's death was Hypertensive Heart Failure, and Obesity and Diabetes Mellitus were contributing causes of death. *Id*. ¶ 161.

II. STANDARD OF REVIEW

The Government Defendants move to dismiss pursuant to Rule 12(b)(6), under which Plaintiffs' pleadings are subject to dismissal if they "fail[] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A pleading must contain a "short and plain statement of the

claim showing that the pleader is entitled to relief and must state a "plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (recognizing "an unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim for relief). A claim has facial plausibility when the plaintiff, "pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged." *Id.* ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" (quoting *Bell Atlantic Corp.*, v. *Twombly*, 550 U.S. 544, 555 (2007))).

At this stage, all well-pleaded allegations in a complaint must be considered as true, and all factual allegations must be construed in the light most favorable to the plaintiff. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999). In evaluating the complaint, unsupported legal allegations need not be accepted. *Revene v. Charles Cty. Comm'rs*, 882 F.3d 870, 873 (4th Cir. 1989).

In resolving a motion under Rule 12(b)(6), a court considers matters only within the pleadings. If matters outside the pleadings are presented, and are considered, the motion shall be treated as one for summary judgment pursuant to Rule 56. *Humphrey v. Nat'l Flood Ins. Program*, 885 F. Supp 133, 136 (D. Md. Apr. 28, 1995). Under limited circumstances, however, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgement. *Goldfarb v. Mayor & City Council*, 791 F.3d 500, 508 (4th Cir. 2005). In particular, a court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines v. Valley Comm. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (internal citation omitted).

III. ANALYSIS

In the Amended Complaint, Plaintiffs assert seven causes of action, three of which implicate some or all of the Government Defendants. The Governmental Defendants have moved to dismiss the following:

> Count 2: Estate of James Stevens Against Sheriff Craig Robertson and Captain R. Lee Cutter, *in their official capacities*, and Board of County Commissioners for Allegany County, Maryland, 42 U.S.C. § 1983– *Monell* claim
>
> Count 3: Estate of James Stevens Against Board of County Commissioners, Article 24 of the Maryland Declaration of Rights– Respondeat Superior Liability For the Medical Defendants' State Constitutional Violations
>
> Count 4: Estate of James Stevens Against Craig Robertson and R. Lee Cutter, *in their individual* capacities, and Board of County Commissioners Article 24 of the Maryland Declaration of Rights– *Longtin* Claim

(ECF No. 6 at 37– 41), *see also* (ECF No. 65 at 7).

These claims are addressed in turn.

A. Count II: *Monell* claims pursuant to 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code "provides that '[e]very person,' who, under color of state law causes the violation of another's federal rights shall be liable to the party injured by his conduct." *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014) (quoting 42 U.S.C. § 1983). Notably, "Section 1983 'is not itself a source of substantive rights,' but merely provides a 'method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144, n.3 (1979)). Therefore, the first step in considering a § 1983 claim is to pinpoint the federal right, if any, which was violated. *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).

In terms of the federal right allegedly infringed upon here, the Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishment." U.S. Const. amend VIII. The protection conferred by the Eighth Amendment imposes on prison officials an affirmative "obligation to take reasonable measures to guarantee the safety of the inmates themselves." *Whitney v. Albers*, 475 U.S. 312, 319–20 (1986). The Eighth Amendment is violated when an inmate is subjected to the "unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (establishing officials have a constitutional duty to provide medical care to prisoners). Accordingly, "[i]t is beyond debate that a 'prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment.'" *Gordon v. Schilling*, 937 F.3d 348, 356 (4th Cir. 2019) (quoting *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014)).

With respect to the §1983 claims, Plaintiffs argue that Decedent's Fourteenth Amendment[9] rights were violated by the deliberate indifference of the Medical Defendants to his serious medical needs while he was incarcerated at ACDC.[10] Plaintiffs, however, do not contend that any of the Government Defendants played any direct role in Mr. Stevens' medical care or decision-making, nor that they were aware that Mr. Stevens was detained at ACDC.[11] Instead, Plaintiffs argue that the Medical Defendants' deliberate indifference was due to their alleged adherence to a custom/policy of the Government Defendants to reduce costs by disfavoring the medical transfer

---

[9] The Fourteenth Amendment makes the Bill of Rights applicable to state actors. *Mapp v. Ohio*, 367 U.S. 643, 655 (1961).

[10] As a practical matter, the Court of Appeals for the Fourth Circuit does not distinguish between the Eighth and Fourteenth Amendments in the context of a pretrial detainee's civil rights claim. *See Sweitzer v. McGuinn*, 2017 WL 4516711, at *8 (D. Md. Oct. 10, 2017) (citing *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992)).

[11] The closest Plaintiffs come to arguing any direct role is to allege that "on information and belief," Defendant Cutter was present at ACDC when the Decedent began his detention. (ECF No. 6 ¶ 24).

of detainees for medical treatment at outside facilities, as enacted by Captain Cutter and Sheriff Robertson, and ratified by the County.

The theory of a constitutional violation through propagation of an unconstitutional policy originated with the United States Supreme Court's decision in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). In *Monell*, the Court held that a government entity can face § 1983 liability when the execution of a policy or custom — whether made by lawmakers or by those whose edicts may be fairly said to represent official policy of that government — inflicts injury. This, in turn, requires Plaintiffs to show that Decedent's injuries were the result of some policy or custom attributable to the Government Defendants. *See Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987).[12]

A *Monell* plaintiff can establish the existence of an unconstitutional policy or custom in one of four ways:

> (1) [A] formal policy, regulation or ordinance; (2) an express decision of an official with final policymaking authority; (3) the municipality's failure to train its employees, such that the municipality was deliberately indifferent to the constitutional rights of its citizens; or (4) a persistent and widespread practice of unconstitutional conduct by municipal employees so as to become a custom or usage of the municipality.

*Williams v. Mayor, Balt. City*, 2014 WL 5707563, at *3 (D. Md. Nov. 4, 2014) (internal quotation marks omitted); *see Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999).

Plaintiffs arguably rely on the first, second, and fourth avenues to establish the existence of an unconstitutional policy or custom discouraging medical transfers attributable the Government Defendants. (ECF No. 65 at 10). For their part, the Government Defendants respond

---

[12] *See also Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("More is required in an official-capacity action, however, for a governmental entity is liable under § 1983 only when the entity itself is a 'moving force' behind the deprivation, thus, in an official-capacity suit the entity's 'policy or custom' must have a played a part in the violation of federal law.") (internal citations omitted).

that these claims must fail as Plaintiffs do not provide allegations to support a reasonable inference that such a policy existed, nor is there any causal link between any purported policy and Decedent's death.

As an initial matter, the Government Defendants' longstanding policy of outsourcing detainee medical care to third party providers, by itself, does not equate to an unconstitutional policy adopted with deliberate indifference. *See, e.g.*, *Medley v. Shelby Cty.*, 742 Fed. App'x 958, 962 (6th Cir. 2018) ("Th[e County's outsourcing] policy is not facially unconstitutional, for a County 'may constitutionally contract with a private medical company to provide healthcare services to inmates.'" (quoting *Winkler v. Madison Cty.*, 893 F.3d 877, 901 (6th Cir. 2018))). Further, Plaintiffs proffer no allegations that allow a reasonable inference that outsourcing inmate medical to CCS *per se* raised an "obvious risk to inmates' constitutional rights to adequate medical care." *Winkler*, 893 F.3d at 902.

Plaintiffs do not point to any written policy, regulation, or contract provision in support of their allegations of deliberate indifference, nor could they. To the contrary, all such written provisions bely any such policy. For example, ACDC Detention Center Regulations (which Plaintiffs reference in their Amended Complaint) provide that "emergency medical care is available 24 hours per day for inmates, staff, visitors, etc.; [and] that there is ready access to hospitals, clinics and medical centers . . . ." (ECF No. 55-2 at 1). Further, the contract between the County and CCS provides that CCS will receive full reimbursement for any such hospitalities, thereby removing any economic disincentive to transfer a detainee when, in CCS' medical judgment, such transfer is medically appropriate. (ECF No. 55-3 at 3).

Rather, Plaintiffs contend that the "policy" at issue is an unwritten one whereby the Government Defendants discouraged CCS and the Medical Defendants from undertaking medical

13

transfer to outside institutions for budget reasons, and that the Medical Defendants demonstrated deliberate indifference by adhering to that policy rather than transferring Decedent to an outside facility when his medical condition deteriorated. (ECF No. 6 ¶ 112).

The Court of Appeals for the Fourth Circuit requires that to prevail on such a *Monell* claim, Plaintiffs must point to a "persistent and widespread practice[] of municipal officials,' the duration and frequency of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their "deliberate indifference." *Holloman v. Markowski*, 661 Fed. App'x 797, 799 (4th Cir. 2016) (quoting *Owens*, 767 F.3d at 402). "While we can infer both knowledge and deliberate indifference from the 'extent of the employees' misconduct [,s]poradic or isolated violations of rights will not give rise to *Monell* liability; only widespread and flagrant violations will.'" *Id.* (quoting *Owens*, 767 F.3d at 402–03).

To that end, Plaintiffs point to two incidents to support their allegation that "on information and belief," Captain Cutter "adopted" policies and practices to minimize outside hospitalizations for budgetary reasons. (ECF No. 6 ¶ 112). First, Plaintiffs describe minutes from a meeting between Captain Cutter and the County Commissioners in September of 2017 (approximately ten months after Mr. Stevens' death) relating to the proposed renewal of the CCS contract. (ECF No. 6 at 26). As recorded in these minutes, Captain Cutter addressed a Commissioner's question about how Allegany County was able to keep its Detention Center medical costs down when other counties were seeing an increase. *Id.* According to the minutes:

> Captain Cutter replied that there are several ways that costs are kept down. First, he said to keep in mind that there is 24/7 coverage on the medical contract at the Detention Center, and it includes dental, psychiatry, and counseling, which keeps a lot of the costs down, because most medical services are handled in-house. He pointed out there are very few transports out of the facility, resulting in fewer hospital bills for the Detention Center and also for the contractor

(ECF No. 6 ¶ 112 (including partial quote)); (ECF No. 55-5 at 3 (outlining full quote)).

14

Far from demonstrating a policy limiting medical care, Captain Cutter describes a contract that provides around-the-clock in-house coverage (including psychiatric and counseling services). The result being that inmates were not required to leave the facility for such services, even when necessitated after-hours. In other words, by providing *more* access to medical and related services on-site, prison officials did not need to delay the provision of such services until transfer to an outside facility could be arranged. From the allegations here, it is simply not a reasonable inference that there was a policy discouraging transfer, and that the Medical Defendants who treated Mr. Stevens were motivated by such a policy, particularly in the face of written regulations to the contrary, including contractual provisions that fully reimburse CCS should such transfers be necessary.

Second, Plaintiffs refer to a newspaper interview of Captain Cutter discussing the CCS contract from November of 2016 (the same month as Decedent's death). That article reads, in pertinent part:

> "[The CCS contract] has to read exactly how you want it," said Cutter, "because you are basically taking just under $1 million of taxpayer money and I have to treat that as if it's my own money — actually I treat that money more tightly than I treat my own because it is taxpayer money. I owe it to the taxpayer to negotiate the best deal I can for the County." The detention center provides routine medical care to an average of 1,500 inmates annually, officials said. However, in some cases, an inmate may have a costly diagnosis such as a rare blood disorder, in which case the facility would be required to provide the cost of treatment. "You can't predict what illness an individual has once they get arrested," said Cutter. "You can't project that." Just because they're ill, or just because they're sick or have some kind of disease — you can't let them out[,]" said Cutter. "You can't let them go, they're there for a reason. The courts put them there and only the courts can let them out."

(ECF No. 6 ¶ 113 (incorporating partial quote)); (ECF No. 55-4 at 1–2 (including full quote)).

Captain Cutter's media statement regarding his fiscal responsibility in negotiating County contracts in the best interest of County taxpayers is, at best, a generic statement of responsible

governing — especially in reference to a contract that itself contains no provisions inhibiting patient transfer and no financial disincentives for doing so. His statement that "you can't let them out," cannot reasonably be understood to refer to transfer decisions. This is especially true in the context of the remainder of the article, which recognizes that ACDC takes its detainees as it finds them medically, and as their custodian must be prepared for both complicated underlying conditions (such as rare blood disorders), as well as less serious ones. Again, it is far from a reasonable inference to conclude that this articulated a policy against medically indicated transfers.

Even if these two interactions involving Captain Cutter amounted to policy pronouncements discouraging patient transfers to keep the County's costs low, there is no evidence that the Medical Defendants conformed to that preference beyond Plaintiffs' unadorned assertion that "on information and belief" CCS was aware and adopted this policy of keeping inmate care in-house as much as possible. (ECF No. 6 ¶ 114). Rather, to the contrary, the CCS contract provided that CCS would be fully reimbursed for the cost of such transfers. Further, there are no allegations or examples of others suffering adverse health effects because CCS did not transfer them to outside care. Finally, there are no allegations that any of the Government Defendants played any role (or even had any knowledge of), the Medical Defendants' decision-making with respect to the Decedent.

Plaintiffs seek to fill this analytical gap by asserting general statistics about the care at ACDC. Plaintiffs emphasize that in November of 2016 (the month that Decedent died), there were 1,221 on-site visits "for sickness, physicals, wound care and other treatments" but no emergency room transfers, and that from 2016–2018, ACDC averaged 1.4 emergency room visits for inmates per month. *Id*. ¶ 115–16. However, there are no specific facts that suggest that any of these patients required transfer or any untoward outcomes resulted from this lack of transfer, nor is it a

reasonable inference. For example, it would be surprising to learn that individuals needed an Emergency Department visit for a physical, wound care, diabetes management, or other routine treatments.[13] Nor do Plaintiffs allege any facts showing that any of these occasions involved constitutional violations, let alone that the that the County remained deliberately indifferent to such.[14] Similarly, Plaintiffs point to Captain Cutter's statement to the County Commissioners that seventy percent of detainees are undergoing alcohol or drug withdrawal symptoms, but allege no facts suggesting that ACDC's in-house drug withdraw protocols are insufficient (except as applied to Decedent due to his underlying medical conditions), or that they routinely resulted in adverse outcomes. *Id*. ¶ 185. In fact, no such outcomes are described except for those of the Decedent. Naked assertions of wrongdoing, such as these, "necessitate some 'factual enhancement within' the complaint to cross 'the line between possibility and plausibility of entitlement to relief,'" in order to proceed past this stage. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly*, 550 U.S. at 557)).

Having found no asserted facts that permit the reasonable inference that a policy against medical transfer existed, or that such a policy motivated the Medical Defendants' treatment

---

[13] As the County Defendants note, "a more realistic and unsurprising conclusion to be drawn from those numbers is that the ready availability of medical treatment in the ACDC might well be inferred as reducing the need for visits to the emergency room and/or other forms of hospitalization." (ECF No. 68 at 11).

[14] *Compare Devi v. Prince George's Cty.*, 2017 WL 3592452, at *4 (D. Md. Aug. 21, 2017) ("Plaintiff fails to allege any facts to support a known history of persistent and widespread constitutional deprivations . . . . Plaintiff merely alleges that a pattern or practice [of constitutional violations] has been manifested in 'other prior incidents involving town officers,' without providing any reference to actual prior incidents involving County officers."), *and Lanford v. Prince George's Cty.*, 199 F. Supp. 2d 297, 305 (D. Md. Apr. 2002) (finding insufficient support for *Monell* claim when Plaintiff provided "conclusory factual allegations devoid of any reference to actual events"), *with*, *Owens*, 767 F.3d at 403 (determining plaintiff provided sufficient information to proceed with the *Monell* claim, including plaintiff's allegations of "the existence of 'reported and unreported cases' and numerous 'successful motions'" with regard to the constitutional violation at issue), *Chen v. Mayor of Balt.*, 2009 WL 2487078, at *5 (D. Md. Aug. 12, 2009) (permitting plaintiff's *Monell* claim to proceed past the motion-to-dismiss stage as he had alleged "two separate incidents," which occurred one week apart, wherein the city had purportedly committed analogous constitutional violations).

decisions in this case, Plaintiffs' *Monell* claims as asserted in Count Two against the Government Defendants are DISMISSED.

B. Count III- County Respondeat Superior Liability for the Acts of the Medical Defendants

Seemingly, under Count III, Plaintiffs contend the County Commissioners are liable under the *respondeat superior* doctrine for the Medical Defendants' violations of Decedent's state constitutional rights that occurred while they were acting as agents of the County and pursuant to County policies, practices, and customs. (ECF No. 6 ¶ 194).

A municipality can, under certain circumstances, be held liable for the constitutional deprivations of its contractors. *See e.g.*, *Burnett v. Bishop*, 2017 WL 430517 (D. Md. Jan. 31, 2017); *Whitten v. Atyia*, 2019 WL 1430005, at *8 (W.D. Va. Mar. 29, 2019), *aff'd*, 776 Fed. App'x 817 (4th Cir. 2019) ("It is well established that a state-employed physician who provides medical services to inmates is a state actor, whether he works directly for the state or under contract."); *Ancata v. Prison Health Servs.*, 769 F.2d 700 (11th Cir. 1985) ("Although [PHS] has contracted to perform an obligation owed by the county, the county itself remains liable for any constitutional deprivations caused by the practices or customs of [PHS]."). However, this is not the case here, because while the Amended Complaint may adequately state allegations of medical negligence against the Medical Defendants, it fails to support a cause of action against them for constitutional violations, or violations of the Maryland Declaration of Rights. *See, e.g.*, *McManus v. Elliott*, 2020 WL 533010, at * (D. Md. Jan. 31, 2020) ("[A]n inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard."). Further, the Complaint fails to adequately allege that any actions by the Medical Defendants were motivated by any policy to curtail medical transfers.

Nor do other tenets of agency law save these claims. The Court notes that the Medical Defendants are expressly neither employees nor agents of the County pursuant to the express terms of the CCS contract. (ECF No. 55-3 at 14). Further, allegations regarding the requisite control that a purported principal must have over an alleged agent's conduct are entirely absent from the Amended Complaint. *See Green v. H&R Block, Inc.*, 355 Md. 488, 503 (1999) (citing *United Capitol Ins. v. Kapiloff*, 155 F.3d 488, 498 (4th Cir. 1998)).

As for whether the Medical Defendants had apparent authority, Plaintiffs lack the necessary element of reliance by Decedent on the purported agency relationship. *Debbas v. Nelson*, 389 Md. 364, 385 (2005). There is no allegation that ACDC "held out" the Medical Defendants as its agents or, as importantly, that Decedent relied on the existence of that relationship in choosing to accept treatment. Accordingly, Count III of the Amended Complaint is DISMISSED.

C. Count IV– Plaintiffs' *Longtin* Claim

Count Four of the Amended Complaint asserts a "*Longtin*" claim against Craig Robertson and R. Lee Cutter in their individual capacities and the Board of County Commissioners under Article 24 of the Maryland Declaration of Rights. (ECF No. 6 at 41). Maryland, like the federal government, imposes liability on municipalities for widespread patterns or practices that cause constitutional injuries. *See McMahon v. County Comm'rs.*, 2013 WL 2285378, at *4 n.6 (D. Md May 21, 2013). However, for the same reasons Plaintiffs' claims under the Fourteenth Amendment fail, Plaintiff cannot maintain a pattern-or-practice claim under the Maryland Declaration of Rights. *Id. See also Rosa v. Bd. Educ.*, 2012 WL 3715331, at *6 (D. Md. Aug. 27, 2012) ("Article 24 of the Maryland Declaration of Rights is the state law equivalent of the Fourteenth Amendment of the United States. Therefore, the analysis under Article 24, is for all

intents and purposes, duplicative of the analysis under the Fourteenth Amendment."). As indicated above, "*Longtin* claims are essentially Maryland's version of *Monell* claims." *Rosa*, 2012 WL 3715331, at *9. Thus, to the extent Plaintiffs are simply reasserting their *Monell* claims against the Board as *Longtin* claims, they fail for the same reasons as Count Two fails. *See, e.g.*, *McMahon*, 2013 WL 22853738, at *4 n.6. Further, *Longtin* does not support claims against Sheriff Robertson and Captain Cutter in their individual capacities as alleged. *See Devi*, 2017 WL 3592452, at *4 ("Plaintiff has not identified any cases holding that a *Longtin* claim against an individual officer would be cognizable under Maryland law.").

Accordingly, Count Four is DISMISSED.

IV. CONCLUSION

For the reasons outlined above, the County Defendants' Motion to Dismiss (ECF No. 55), as to Counts 2, 3, and 4, is GRANTED. Plaintiffs are afforded the opportunity to amend their Amended Complaint to address the deficiencies as outlined by the Court in the accompanying Memorandum. The Second Amended Complaint must be filed on or before May 6, 2020.[15] A separate Order follows.

April 8, 2020

/s/
J. Mark Coulson
United States Magistrate Judge

---

[15] *See Holden v. Bwell Healthcare Inc.*, 2020 WL 1285505, at *5 (D. Md. Mar. 18, 2020) ("The Court initially would have only granted Defendants two weeks to refile, but given this Court's recent Standing Order regarding the COVID-19 pandemic, the Court is preemptively adding an additional two weeks.").